# In re Vito Russo

[991 A.2d 1073]

No. 08-070

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed February 26, 2010

*Allison N. Fulcher* of *Martin & Associates*, Barre, and *Vito J. Russo*, Pro Se, Springfield, for Petitioner-Appellee.

*Tracy Kelly Shriver*, Windham County State's Attorney, Brattleboro, for Respondent-Appellant.

¶ 1. **Skoglund, J.** Petitioner, jailed for a term of twelve-to-fifteen years on a conviction for aggravated assault, sought post-conviction relief (PCR) on the grounds that he did not receive effective assistance of counsel at his trial. The PCR court agreed, concluding that petitioner's trial attorney deprived him of effective representation by failing to engage a firearms expert to testify at trial and failing to test-fire the rifle at issue. The State appeals and argues that the trial attorney's tactical decisions were within an acceptable range of professional judgment and, even if there were unprofessional errors, petitioner produced no evidence showing, within a reasonable probability, that absent those errors the outcome of his trial would have been different. We affirm.

### I. Factual Background

### A. Petitioner's Criminal Trial

¶ 2. In the underlying criminal case, petitioner was charged with and convicted of aggravated assault in violation of 13 V.S.A. § 1024(a), the result of an altercation with a former mortgage holder. To prove this case, the State had to show petitioner attempted to cause bodily injury with a deadly weapon, a bolt-action rifle, by pointing it at the complaining witness and firing it at his vehicle. See 13 V.S.A. § 1024(a)[1]; *State v. Pratt*, 147 Vt. 116,

---

[1] "A person is guilty of aggravated assault if the person:

. . .

(2) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon."

118, 513 A.2d 606, 607 (1986) (per curiam) (attempted aggravated assault includes element of specific intent to harm). Our decision affirming petitioner's conviction on direct appeal contains a full account of the facts of the case, *State v. Russo*, 2004 VT 103, ¶ 3, 177 Vt. 394, 864 A.2d 655, but we recount them here briefly. In 1999, the complaining witness sold petitioner a motel, and under their agreement, the complaining witness held the deed while petitioner made payments on the property. At some point in 2002, petitioner failed to make payments and the complaining witness foreclosed on the property and evicted petitioner and his family, who had been living on the premises. Following the eviction, on the afternoon of November 17, 2002, petitioner went to the complaining witness's place of business, a car sales lot, to offer to pay $5000 for permission to reside in the motel with his family through the holidays. The complaining witness immediately demanded that petitioner leave his property. At this point, according to the complaining witness, petitioner pointed a gun at him, causing the complaining witness to flee the property in his plow truck. Petitioner followed in his standard-transmission Dodge. It was alleged that, as the two vehicles dodged in and out of traffic during a five-mile chase through Brattleboro, at around five o'clock in the afternoon, petitioner fired a bolt-action rifle from his car at the complaining witness's vehicle. Eventually the complaining witness pulled into the Brattleboro Police Station, followed by petitioner, who was then arrested.

¶ 3. During the subsequent search of petitioner's vehicle, police found petitioner's .22 caliber rifle with one live round of ammunition in it, one spent cartridge in the rifle's chamber, bullets in an ammunition box, and four spent bullet casings on the vehicle's floor. Once the police took possession of these items, their investigation ended. They did not assess the gun for operability, nor determine whether the bullets and casings found in the car fit the rifle. Nor did they test petitioner's fingers or the gun for recent firing, or determine the age of the casings.

¶ 4. Petitioner was assigned an experienced criminal defense attorney. Conflict between petitioner and his trial attorney arose almost immediately. Petitioner steadfastly asserted that he did not fire a weapon and wanted to pursue a defense of total denial. The trial attorney, on the other hand, wanted to pursue an insanity or diminished capacity defense based on his intoxication at the time of the incident and the great emotional stress that had resulted

from the foreclosure and eviction. Petitioner insisted that they not formally pursue that line of defense, and, consistent with his instructions, the trial attorney filed no notice of an insanity defense or of expert testimony as required by the Vermont Rules of Criminal Procedure. V.R.Cr.P. 12.1(a) (requiring defense counsel to give advance written notice of expert testimony relating to insanity, mental disease or defect, or any other mental condition that counsel intends to use as a defense at trial). The trial attorney's resulting trial strategy was a mixture of both denial and incapacity. She sought to cast doubt on whether a shooting occurred by undermining the State's evidence that petitioner shot at the complaining witness and that he fired multiple shots, while also arguing that, if he did commit the acts alleged, petitioner's intoxication and mental anguish rendered him incapable of forming the specific intent necessary for the assault charge.

¶ 5. At trial, the State's evidence of the aggravated assault consisted of testimony from the complaining witness, two witnesses to the sounds of the gunshots around the time of the chase, and the arresting officer's testimony about the physical evidence of the gun and ammunition found in petitioner's vehicle. The complaining witness's testimony provided the only direct evidence that petitioner shot the rifle *at* him. He testified that he heard four gun shots during the car chase, saw at least one muzzle flash in his vehicle's rear-view mirror, and could tell that the flash was directed at him. The arresting officer admitted that the police had not tested the rifle to determine operability or whether it had been fired recently. He further admitted that no testing had been done to determine whether the casings found in petitioner's vehicle fit the rifle, how old the casings might be, or whether petitioner had fired a gun recently. It further developed that the ammunition box found held two types of .22 caliber bullets, some of which matched the casings found in the vehicle and others that did not. The State asked no questions of this witness regarding muzzle flashes or if one could determine directionality from any flash seen.

¶ 6. The trial attorney's cross-examination of this officer established him as knowledgeable about firearms. She then asked questions of this never-deposed witness that allowed the officer to answer with his opinion that, indeed, a flash probably could be seen from a gun fired at night and that a person seeing a muzzle flash could probably tell which direction the gun was pointed — not what the trial attorney wanted to have the jury hear.

¶ 7. The two ear witnesses testified to "hear[ing] noises that could have been gun shots at about the time of the [chase]." Both had some connection to the complaining witness — one was trying to purchase the same motel from the complaining witness that petitioner had just lost — and they presented conflicting versions of when the noises occurred.

¶ 8. The jury found petitioner guilty. This Court upheld his conviction on direct appeal. *Russo*, 2004 VT 103, ¶ 1.

## B. The Post-Conviction Relief Proceedings

¶ 9. After losing on direct appeal, petitioner filed a PCR petition in superior court claiming that his trial counsel was ineffective for three reasons: first, she failed to depose any witnesses prior to trial; second, she failed to retain an expert to testify regarding the likelihood of muzzle flashes from petitioner's rifle and the ability of a person to tell the direction of a shot from a muzzle flash; and third, she failed to have an expert test petitioner's rifle to determine whether it produced a muzzle flash when fired or whether a person could generally tell the directionality of a shot from the muzzle flash.

¶ 10. To make his case, petitioner presented expert testimony from an experienced defense attorney, as well as the experimental results and testimony of two private investigators who tested a variety of firearms for evidence of muzzle flash. The PCR court found that "No muzzle flash was observed in the firings. At one shot with the revolver, an apparent 'cylinder flash' was seen. This is a flash from the area of the cylinder of a revolver and not from . . . the muzzle. The original [bolt-action] rifle obviously did not have a cylinder." The PCR court found that these tests, as conducted, were not sufficiently similar to the conditions of the original incident and the guns tested were not similar enough to the gun used in the alleged assault to provide reliable results. The PCR court concluded that the tests would probably not have been admissible at trial. Testimony at the PCR hearing additionally established that the Bureau of Alcohol, Tobacco and Firearms held the actual weapon and would not permit petitioner's experts to use it in preparation for the PCR hearing because it was illegal, nor could they make an exact copy because of the gun's illegally shortened barrel.

¶ 11. One of petitioner's investigators also testified that he drove the route followed by the complaining witness and petitioner

during the incident while trying to operate a bolt-action BB gun. He said that he was unable to operate the rifle with any success. The other investigator testified that an observer probably could not tell which direction a gun was aimed, even if he or she observed a muzzle flash.

¶ 12. Petitioner's attorney expert witness testified as to the performance of petitioner's trial attorney relative to the professional standards for criminal defense attorneys in Vermont. The expert testified that the trial attorney was ineffective because she made an unprofessional error in not deposing at least the complaining witness and the lead investigating officer, as well as by not investigating other possible witnesses to the incident. While the expert agreed that a lawyer need not depose all witnesses, he stated that pinning the complaining witness down on his version of events would outweigh any concerns over revealing defense strategy. Additionally, the expert faulted the trial attorney's trial strategy generally, opining that she failed to have a coherent "theory of the case" and ended up jumping between denial of shots being fired and an intent defense that focused on intoxication and emotional distress.

¶ 13. Finally, petitioner's expert was most critical of the trial attorney's failure to have the rifle tested for muzzle flash and to call her own expert to testify as to the flash and directionality. He discounted the State's contention that conducting such tests could have hurt the defense by giving the State more incriminating evidence or foreclosing certain arguments for the defense. He believed the defense had little other evidence on its side in this case; thus, proving there was no flash would be worth the risk. Furthermore, he explained, even without the muzzle-flash tests, defense counsel could have had an expert testify that a muzzle flash does not accurately indicate the direction of gunshots. The expert stated that cross-examining the State's witness, the police officer, in an effort to bring out evidence regarding whether the direction of a gunshot could be determined from a muzzle flash was "grossly ineffective" because she asked these questions without deposing the witness and because a proper level of representation would have involved using a defense expert on this question.

¶ 14. The State, too, called an experienced criminal defense attorney as an expert to testify that the trial attorney's representation, while not of the highest possible quality, was adequate. The State's own expert expressed doubt about the trial attorney's

performance, specifically her decision to question the police officer about muzzle flash when she had not deposed him and did not know how he would answer the questions. However, he opined that testing firearms for muzzle flash in this case was not worth the risk of revealing incriminating evidence or foreclosing a defense strategy, especially when the trial attorney could instead focus on the State's failure to conduct such tests.

¶ 15. After hearing this evidence, the PCR court granted the petition, concluding that the trial attorney's failure to perform the tests for muzzle flash on the rifle and to have a firearms expert testify at trial fell below the standard of professionalism, and that, but for these two failures, petitioner was reasonably likely to have received a different result at trial.

## II. Discussion

¶ 16. The two-part standard for evaluating an ineffective-assistance-of-counsel claim is essentially equivalent under the United States and Vermont constitutions. See *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984) (federal habeas corpus); *In re Pernicka*, 147 Vt. 180, 182-83, 513 A.2d 616, 617-18 (1986) (post-conviction relief); see also *In re Dunbar*, 162 Vt. 209, 213, 647 A.2d 316, 320 (1994) (referring to *Strickland/Pernicka* test). The first prong of this test is an inquiry into the "reasonable competence [of the lawyer] as measured by the prevailing standards in the conduct of the defendant's case." *Pernicka*, 147 Vt. at 182, 513 A.2d at 617 (quotations omitted). In evaluating this objectively reasonable professional standard, "we are not permitted to use hindsight." *In re Washington*, 2003 VT 98, ¶ 8, 176 Vt. 529, 838 A.2d 87 (mem.). We must also recognize that "trial of [a] case . . . [is] susceptible to more than one strategy. The proper question is whether trial counsel had *any* reasonable strategy and whether they pursued it with adequate preparation and diligence." *Dunbar*, 162 Vt. at 213, 647 A.2d at 320 (emphasis added). The second prong of the test evaluates whether, if counsel's performance did fall below the objective standard, such failure created a "reasonable probability" that effective counsel would have produced a different outcome. *Id.* at 212, 647 A.2d at 319. A PCR court making this inquiry must "ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Strickland*, 466 U.S. at 696.

¶ 17. In reviewing a PCR court's application of this standard, we strike a characteristically deferential pose. Specifically, we apply a "clearly erroneous" standard to the PCR court's findings of fact and will uphold the PCR court's judgment if "the conclusions follow from the findings" — again reversing only for clear error. *Dunbar*, 162 Vt. at 211, 647 A.2d at 319.

¶ 18. Studying the facts of the underlying case and keeping in mind that the legal standard for a criminal conviction is guilt beyond a reasonable doubt — and thus acquittal required only injecting such doubt — it is clear that the State's case was weak. And, because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support," *Strickland*, 466 U.S. at 696, it bears highlighting the insubstantial nature of the evidence that the State put forth at trial in assessing how deeply the errors of petitioner's trial attorney affected his case.

¶ 19. As noted above, to obtain a conviction under 13 V.S.A. § 1024(a)(2), the State had to show petitioner "attempt[ed] to cause . . . bodily injury . . . with a deadly weapon," the bolt-action rifle, by pointing it at the complaining witness and firing it at his vehicle. As the PCR court noted, the only direct evidence of the charged crime was from the complaining witness himself. Despite the fact that the alleged chase dodged in and out of traffic for five miles at around five o'clock in the afternoon in Brattleboro, the only witnesses called to corroborate the complaining witness's story that bullets had been fired were ear witnesses who merely "heard noises that could have been gun shots at about the time of the [chase]." Both ear witnesses were identified by the PCR court as having some connection to the complaining witness "that could have caused them to be biased in his favor."

¶ 20. Lacking any direct physical evidence, i.e. bullet holes, the State's only evidence that petitioner had fired any weapon at all, other than the complaining witness's allegation, came from a search of petitioner's vehicle upon arrest. In the car, police found bullets, shell casings, and a rifle, which petitioner told police he used for target shooting and regularly left in the car. As noted, once the police found these items, there was no further investigation. The gun was not assessed for operability, nor did police determine whether the bullets and casings found in the car fit the gun at all. They likewise neglected to test petitioner's fingers for recent firing or to determine the age of the casings.

¶ 21. To prove beyond a reasonable doubt that petitioner had sped through traffic, shifting gears while simultaneously loading and firing a bolt-action rifle out his window and intending to injure the complaining witness, the State could muster no more than a claimed muzzle flash and these few ear witnesses. The State's own expert witness at the PCR hearing bluntly described the strength of the State's case as "terrible, frankly." Given the evidence presented at trial, the underlying verdict surely could be described as "weakly supported" and "likely to have been affected" by the blatant mistakes of petitioner's trial attorney. *Strickland*, 466 U.S. at 696.

¶ 22. As the PCR court found, the trial attorney made mistakes throughout this case, from poor pretrial planning, to inadequate organization of the case, to a patently flawed execution at trial. At the outset, she chose not to depose any of the State's witnesses, instead relying on her own sense of the case and a few sworn statements. While the PCR court held that failure to depose witnesses or interview them for impeachment purposes was not ineffective counsel per se, it noted that in this case the tactical decision "may have, in hindsight, badly backfired."

¶ 23. As part of her inadequate trial preparation, the trial attorney failed to retain any expert witnesses to challenge the State's central contention that petitioner had aimed and fired his gun at the complaining witness. The PCR court found that she believed, based on her own experience, that petitioner's gun would not produce a muzzle flash and — though she saw this issue as "crucial" to the State's case — she failed to enlist an expert to support this theory. The trial attorney apparently believed that it would be clear to the jury how difficult it would have been to work a bolt-action rifle with one hand while operating a vehicle at the speed assumed without the benefit of any direct evidence or testimony. As the PCR court found, she did not seek court authorization to have any tests conducted on the rifle or experiment with it as far as its operation. This lack of preparation proved costly.

¶ 24. Because she had not deposed witnesses or employed experts, the trial attorney attempted at trial to use other means to elicit supportive testimony about the alleged muzzle flash and shot direction. As noted, the State called one of the responding officers in its case in chief, but asked no questions of this witness regarding muzzle flashes or directionality. In her cross-

examination of this witness, the trial attorney asked questions that the PCR court found "clearly inferred a muzzle flash could be seen if a gun was fired at night," thus supporting a central element of the State's case. The State's expert witness at the PCR hearing agreed that the trial attorney's questioning at trial appeared to assume a shot had been fired. She continued questioning this witness, attempting to elicit testimony that a muzzle flash would not show the direction of the shot. He responded that one "could probably tell what direction the gun was pointed [from seeing the flash]," what the PCR court rightly characterized as a "damaging response." As the PCR court found, her failure to provide an expert on ballistics left the jury "with damaging testimony about muzzle flash and bullets and ballistics from state witnesses, who might not have been even qualified to give such testimony but for defense counsel initiating the inquiries from an apparent lack of her own experts."

¶ 25. Her cross-examination of the complaining witness was inconsistent with her claimed focus on the evidence of a muzzle flash as crucial to the State's required element of showing shots were fired at the complaining witness, not just randomly or not at all. In reporting the incident to the police, the complaining witness had claimed he saw a "big ball of fire" when petitioner was chasing him. At the PCR hearing, the trial attorney testified that she believed the witness's credibility at trial would be weakened by such apparent exaggeration. However, at trial she never challenged the witness as to any flash or gunshots and left the testimony as presented, that he merely saw "a flash," uncontested. As the PCR court noted:

> [S]he made no effort to obtain an expert for pre-trial work and preparation or to testify about such gun fire and muzzle flashes. . . . She had nothing to challenge [the complaining witness's] assertion he saw a flash. For a case that counsel indicated clearly depended on firearms and ballistics to a great degree, especially if the eyewitness claims to shots being heard and seen were to be challenged, it is impossible to understand how an expert of one's own in the field would not be the minimal expected level of representation.

¶ 26. The PCR court went on to conclude that the trial attorney's failure to "perform[] at the required standard" created

the "likelihood of a different result" in petitioner's criminal trial and found "that counsel's efforts made the results of the trial so suspect or unreliable as to require a new trial."

¶ 27. While the PCR court opined that the expert testimony on muzzle flash submitted at the PCR hearing would not have been admissible at trial, the court unequivocally noted that its decision did not rely on the admissibility of such tests. It held that "clearly from the expert testimony at the hearing, it would have been possible for an expert to testify about muzzle flash and the lack of direction issue and the likelihood of it being observable generally," evidence to discredit the complaining witness's account. Thus, the fact that the test results offered at the PCR hearing may have had too many variables and differences from the actual claimed event to be admissible at the criminal trial was not part of the PCR court's holding; it was the trial attorney's failure to obtain expert testimony on the issue that damaged petitioner's case at trial. And, it was the trial attorney's failure to have the rifle initially tested that led to it being no longer available for testing for purposes of the PCR hearing.

¶ 28. Without any testing on muzzle flash or directionality in general, petitioner could not refute the most important — and weakest — element in the State's case: whether petitioner fired his gun at the complaining witness. It was this specific failure on the part of the trial attorney that the PCR court felt created "a likelihood of a different result." Given the serious missteps attributable to this lack of expert testimony, see *supra*, ¶ 24, this central failure made the results of the trial suspect or unreliable. The trial attorney actually bolstered the State's case by eliciting damaging testimony from a State's witness. She hamstrung petitioner's case by lacking rebuttal evidence to support the contention that directionality could not be determined based on a muzzle flash and, thus, failing to counter the State's evidence that petitioner shot *at* the complaining witness. The PCR court determined that the absence of this argument created a reasonable probability of a different outcome at trial. See *Pernicka*, 147 Vt. at 184, 513 A.2d at 618 (prejudice shown when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (quoting *Strickland*, 466 U.S. at 694)).

¶ 29. The issue of shot direction was vital to the State's case. Direction showed aim, and aim (specifically at the complain-

ing witness) showed intent to injure — *the* central element to a charge of aggravated assault under 13 V.S.A. § 1024(a)(2). As specially noted by the PCR court, petitioner was not charged under § 1024(a)(1), where recklessly discharging a firearm would come into play. Had the trial attorney engaged the services of a firearms expert and tested the rifle or even had an expert examine the rifle as part of a reasonable investigation, there would have been no need to attempt to use the State's witness to prove petitioner's gun produced no muzzle flash, nor that a muzzle flash did not indicate directionality; she would have been prepared to question and impeach the complaining witness about his claimed sighting of a "ball of fire" muzzle flash. And, to quote the PCR court, "of even more import, had counsel pursued an expert initially, access to the actual gun would have been possible."

¶ 30. Because we recognize that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result," we affirm. *Strickland*, 466 U.S. at 686. The PCR court's opinion is fully substantiated by the evidence and the law.

*Affirmed.*

¶ 31. **Burgess, J.,** dissenting. To prevail on his post-conviction relief (PCR) claim of prejudicial failure by trial counsel to test his weapon for muzzle flash, all petitioner had to do was test the rifle for flash and introduce the results to the PCR court. For reasons known but to petitioner, he did not do so.[2] Instead, petitioner presented a case of purely theoretical and unfounded prejudice, rather than prejudice in fact had any existed. Having failed to prove that the muzzle did not flash, petitioner further failed to establish that his trial counsel's lack of challenge to the State's reference to gunflash for purposes of proving aim was so prejudicial as to have likely affected the verdict in his criminal trial. Speculation to the contrary by the PCR court, and as now adopted by the majority to affirm, is no substitute for the

---

[2] Petitioner does not claim the State withheld the gun from testing, or that it was otherwise made unavailable by the prosecution. The docket reflects no defense motion to obtain the weapon for testing up to the time of hearing. Indeed, the record and the State indicate that access was requested and granted to petitioner after the PCR hearing concluded.

necessary evidence not submitted below by petitioner. I respectfully dissent.

¶ 32. Assuming, even, that the absence of muzzle flash would have impeached the State's witness to the point of exonerating petitioner, the point is moot without any evidence to support the premise. The trial court determined that petitioner's muzzle flash experts failed in their attempted simulation to demonstrate that his rifle was unlikely to produce gunflash. The court then leaped over that failed experiment to conclude, without an iota of demonstrable prejudice, that trial counsel committed a critical error in not experimenting with the actual firearm. To obtain relief for his trial counsel's omission of evidence, petitioner bore the "burden of affirmatively showing what the potential evidence *would have been and how it would have produced a different result.*" *In re Dunbar*, 162 Vt. 209, 216 n∗, 647 A.2d 316, 322 n∗ (1994) (emphasis added); see also *In re Plante*, 171 Vt. 310, 318, 762 A.2d 873, 879 (2000) (declining to address merits of claimed inadequate performance by trial counsel when petitioner could not demonstrate resulting prejudice).

¶ 33. With his only proffer on the lack of muzzle flash rejected by the trial court as unreliable, petitioner showed neither what the results of a relevant flash test "would have been," nor "how it would have produced different results." See *Grisby v. Blodgett*, 130 F.3d 365, 372-73 (9th Cir. 1997) (finding no prejudice where petitioner was unable to test a certain piece of evidence — and therefore unable to show results from such tests that he believed would exonerate him); *People v. Bolin*, 956 P.2d 374, 400 (Cal. 1998) (finding no prejudice where petitioner presented no evidence that any expert "would have provided exculpatory evidence if called"). Whether the test evidence would have been helpful to petitioner, and therefore whether the omission of such evidence was prejudicial, is unknown — the answer remains in the muzzle of the rifle left untested by petitioner.

¶ 34. The PCR court's agreement with petitioner's second argument, that substantial prejudice resulted from trial counsel's failure to secure expert testimony to dispute the State's evidence that shooting direction could be discerned from gunflash, was not sufficiently supported. Again, petitioner had the burden to show what exculpatory testimony could have been presented, and how that testimony would have been reasonably likely to change the outcome at trial. *Dunbar*, 162 Vt. at 216 n.∗, 647 A.2d at 322 n.∗.

Petitioner's expert opined only that an observer of muzzle flash could not tell the particular direction of gunfire, as opposed to it being wildly fired towards the air or elsewhere. The expert did not refute the police testimony that gunflash could indicate general direction of gunfire.

¶ 35. Even if the expert proffered that muzzle flash indicated no direction whatsoever, such testimony would still not suffice to establish that, as a result, a different verdict was likely. It was petitioner's "burden of showing that the decision reached would reasonably likely have been different" if such testimony had been presented. *Strickland v. Washington*, 466 U.S. 668, 696 (1984). This is not examined within the four corners of petitioner's claim, but in light of the totality of the evidence presented at trial. *Id.* at 695. Petitioner must prove the prejudice claimed by a preponderance of the evidence. *In re Washington*, 2003 VT 98, ¶ 8, 176 Vt. 529, 838 A.2d 87 (mem.).

¶ 36. Petitioner's expert would have neither overwhelmed nor significantly undermined the State's case. It is settled that the State's evidence, including the complaining witness's testimony about gunfire in his direction based on his observation of at least a single gunflash, was enough to prove petitioner's guilt beyond a reasonable doubt. *State v. Russo*, 2004 VT 103, ¶ 7, 177 Vt. 394, 864 A.2d 655. Petitioner's expert testified that gunflash could not establish a specific shooting direction, while the State's investigating police witnesses, who were available at trial, testified that flash could indicate direction. That there are merely competing opinions on this lone issue does not make a different result reasonably likely. See *State v. Link*, 25 S.W.3d 136, 149 (Mo. 2000) (en banc) (concluding that petitioner could not meet prejudice requirement because had defense called expert, prosecution would have called its own expert to counter, resulting in no likelihood of different outcome). Moreover, the verdict was not based on the complaining witness's observation of a gunflash alone, but on the corroborating testimony of witnesses who heard what sounded like shots, and the police who found petitioner's rifle leaning against the front passenger's seat in his car, loaded and with a spent shell in the chamber, four other spent casings in the car, and live rounds on petitioner who followed the complaining witness to the police station at the end of what the complaining witness described as a chase.

¶ 37. No evidence at trial suggested the shots were fired other than in the complaining witness's direction. Petitioner's defense

was absolute denial and he did not testify. From the available evidence it could be reasonably concluded beyond a reasonable doubt that petitioner pointed a gun at the complaining witness during their initial confrontation, that petitioner then chased the complaining witness, that petitioner was armed in his car, and that shots had been fired from his car. Neither at trial, nor at the later PCR hearing, did petitioner present any credible evidence to contradict the complaining witness's observation of gunflash from petitioner's car while being pursued by petitioner. It may be that petitioner chased the complaining witness shooting his rifle to leaven the early dark of autumn, to celebrate his unfortunate eviction, to tattoo the complaining witness's truck, or just to annoy the neighborhood, but no such alternative rationales were offered for the jury's consideration. Nor do they appear especially likely — and it was not the State's burden to dispel such notions in any event. *State v. Derouchie*, 140 Vt. 437, 445, 440 A.2d 146, 149-50 (1981) (rejecting "exclusion of every reasonable hypothesis of innocence" test and holding "whether the evidence is direct, circumstantial, or a combination of both," prosecution satisfies its burden of proof if evidence, when viewed in light most favorable to State, is persuasive of guilt beyond a reasonable doubt). The jury required no specialized or corroborating evidence on gunfire direction to reach a most obvious conclusion that petitioner, who threatened the complaining witness with a gun and then pursued him shooting, was attempting to cause the complaining witness "bodily injury with a deadly weapon" as charged.[3]

¶ 38. Given the PCR court's conclusion that petitioner's experts had no reliable evidence by which to sink the complaining witness's underlying observation of muzzle flash and impeach him as an exaggerator, the experts could only counter that the gunflash described by the complaining witness was not particularly directional. The State's police witnesses were available, in turn, to counter this contention. The testimony of the police witness would be entirely consistent with the balance of the State's evidence that petitioner used a gun to threaten, chase, and shoot at the complaining witness. The testimony of petitioner's expert might have partially contradicted the complaining witness's

---

[3] Similarly, in denying petitioner's motion for acquittal after the jury's verdict of guilty, the trial court concluded from this evidence that there was no evident reason for petitioner to fire the weapon other than to cause bodily injury to the victim.

perception of the gunfire being aimed in his direction, but offered nothing to derail the essential elements of the State's version of the offense — a version that remains uncontroverted.

¶ 39. The PCR court expressly noted that petitioner's firearms "experiment had too many variables and differences from the actual event to have been admissible at trial." Thus, the court did not perceive this evidence as particularly exculpatory, and it does not appear more so on appeal. Whatever question the expert could raise concerning the complaining witness's lay-observation on direction of fire would not, by a preponderance of evidence, lead the jury to a different verdict. See *Evans v. Thompson*, 465 F. Supp. 2d 62, 82 (D. Mass. 2006) (rejecting ineffective-assistance-of-counsel claim premised on failure to call ballistics expert because none of proposed expert testimony would have significantly challenged State's version of events); see also *Strickland*, 466 U.S. at 696 (noting that petitioner, even if he does present some countervailing evidence, is less likely to be able to prove prejudice when a jury's verdict rests on "overwhelming record support").

¶ 40. Petitioner's expert opinion was not so exculpatory as to have had a "pervasive effect on the inferences to be drawn from the evidence [presented at the criminal trial], altering the entire evidentiary picture" such that a different verdict is reasonably likely. *Strickland*, 466 U.S. at 695-96. Avoiding this fact, the trial court and the majority draw too much on mere possibilities and hindsight. To the extent the majority finds the State's case weak or its claims implausible, it seems to substitute its judgment for the jury and for the trial court that it has already once affirmed. PCR is concerned only with what petitioner was able to show at the PCR court and, according to the PCR court, petitioner showed only that his criminal trial counsel negligently failed to secure an opinion that the direction of shooting may not necessarily be determined from visible gunflashes. This would cast no monkey wrench into the State's overall circumstantial and eye-witness case.

¶ 41. That his trial counsel may have performed below professional standards does not earn petitioner post-conviction relief without proof of prejudice. *Strickland*, 466 U.S. at 694; *In re Washington*, 2003 VT 98, ¶ 8; *Dunbar*, 162 Vt. at 212, 647 A.2d at 319. Risking what the PCR court found to be an unreliable simulation, rather than test firing his weapon, petitioner offered

utterly no evidence of prejudice resulting from trial counsel's failure to test for muzzle flash. The conclusion by the PCR court, and the majority's conclusion here, of prejudice to the defense are wholly unsupported by any evidence, are clearly erroneous, and cannot be sustained. *Massey v. Hrostek*, 2009 VT 70, ¶ 16, 186 Vt. 211, 980 A.2d 768 (reversing where findings insufficient to support trial court's conclusion). Petitioner's complaint of prejudice on account of trial counsel's failure to organize an expert challenge to the State's evidence of shooting direction was almost equally unfounded for lack of materiality. The findings and conclusion to the contrary by the PCR court, and approved by the majority, are not supported by the evidence and should not stand. Accordingly, the judgment of the PCR court granting post-conviction relief should be reversed.

¶ 42. I am authorized to state that Justice Dooley joins in this dissent.