*In re McNeil*, No. 224-4-13 Wncv (Teachout, J., December 8, 2014)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| **SUPERIOR COURT** | **CIVIL DIVISION** |
| **Washington Unit** | **Docket No. 224-4-13 Wncv** |

| | |
|---|---|
| **In re:** | ] |
| **Post Conviction Relief Petition** | ] |
| **of** | ] |
| **DREW McNEIL** | ] |

### DECISION
### Claim of Ineffective Assistance of Counsel

Petitioner Drew McNeil was convicted in the Washington Criminal Division of aggravated assault, a felony, and resisting arrest, a misdemeanor, after a trial held on March 28, 2012. He seeks to vacate the convictions on the grounds of ineffective assistance of counsel at trial. The basis of the petition is that trial counsel failed to object to damaging inculpatory evidence in the testimony of the State's witnesses, and that on cross-examination he elicited detailed inculpatory evidence from the State's witnesses that undermined the defense of self-defense.

An evidentiary hearing was held on September 30, 2014. Petitioner was present and represented by Attorney Kelly Green. Washington County Deputy State's Attorney Kristin Wood represented the State. Attorney Elizabeth Kruska testified as Petitioner's expert. Attorney David Williams testified as Respondent's expert. Attorney James LaMonda, counsel at trial, also testified.

### Findings of Fact

Mr. McNeil was charged with aggravated assault for having pepper sprayed his landlord during an incident at the apartment house where he lived on March 4, 2011, approximately one year before the trial. It is undisputed that he pepper sprayed his landlord during the incident. His defense was one of self-defense: that he felt he was under a threat from the landlord, that he had no choice but to act, and that his response was in proportion to the threat. Mr. McNeil is a person with a disability who is vocal and can be verbally aggressive. It is difficult for him to accept attorney advice on how to present himself.

Attorney James LaMonda represented him at trial. The witnesses at trial for the State were the landlord who had been pepper-sprayed, Mr. Hauser; another tenant, Ms. Blakeney, who witnessed the incident; and a police officer who arrived at the scene of the incident. Mr. McNeil testified at trial in his defense.

All these witnesses, including the police officer, had known each other over an extended period of time. There had been many episodes and accusations amongst them in the past, not only at Mr. Hauser's apartment facility but at another apartment house where Mr. McNeil and the eyewitness had both previously resided. Mr. LaMonda knew at least one of the witnesses. He met with Mr. McNeil several times before the trial.[1] He concluded that there was a high degree of hostility and antagonism among all of the witnesses and that none of them was going to be without credibility problems, including his client.

Mr. McNeil wanted to testify, and would need to testify in order to support his claim of self-defense. Mr. LaMonda was going to need to adopt a defense strategy that took into account the mutual hostility among all the witnesses and the likelihood that all of them would have credibility problems. His job was to present sufficient evidence to support a jury instruction on self-defense, and to maximize the likelihood that the jurors would find the evidence related to self-defense credible. He did, in fact, succeed in having a self-defense instruction included in the instructions the jury received from the judge. The jury obviously did not conclude that Mr. McNeil acted in self-defense, and found him guilty.

Given the credibility problems and hostility of all witnesses, Mr. LaMonda chose a trial strategy whereby he would attempt to use the mutual antagonism and accusations to his client's advantage. The evidence would show that "it was a two-way street." That is, even if Mr. McNeil was seen as aggressive to others, others acted aggressively to him. Other witnesses would be given the opportunity to demonstrate to the jury their own personal hostility toward Mr. McNeil so that the jurors would understand the testimony from Mr. McNeil's perspective; that is, they would adopt his view that at the time of the incident, he was under the threat of having the landlord and two other tenants gang up against him, and that it was reasonable for him to feel under a threat of personal attack and respond in self-defense.

Although Mr. LaMonda had talked with Mr. McNeil in advance of the trial and both the lawyer and client planned that Mr. McNeil would testify, Mr. McNeil's testimony that he had pepper sprayed Mr. Hauser by shooting the spray from behind his own back took Mr. LaMonda by surprise. He had not anticipated that testimony from his client. It reduced the likelihood of a successful self-defense strategy significantly.

The following references are to pages in the trial transcript in which Petitioner alleges that Mr. LaMonda's performance was ineffective assistance of counsel.

*Page 21*

The landlord, Mr. Hauser, was the first witness. In describing the incident, he made accusations against Mr. McNeil for things that Mr. McNeil had allegedly done in the past:

---

[1] There were actually two jury draws, through no fault of Mr. McNeil or Mr. LaMonda. Trial could not proceed with the jury first chosen because jurors became ill and there were not enough for the trial, so a second draw was held and the case went to trial with the second selected jurors.

thrown a lit cigarette at a tenant, and "sent another tenant to the hospital" by smoking. Mr. LaMonda did not object to this testimony or move to strike it. Both experts cite the failure to object as a mistake on Mr. LaMonda's part, as it permitted the jury to hear early on without objection information about Mr. McNeil that was generally prejudicial to his character. Both experts also acknowledge that mistakes are common in trials, and not every mistake of this type, such as a failure to object to a particular piece of testimony, necessarily indicates a failure to meet the lawyer's overall standard of care. Thus, because of the nature of trials, identifying a lawyer's particular act or omission as a "mistake" does not automatically mean that the lawyer's conduct fell below a reasonable level of competence as measured by prevailing standards applicable to the circumstances. Petitioner's expert's opinion on this point was that "there really should have been an objection." The State's expert agreed that Mr. LaMonda should have objected to this testimony of Mr. Hauser. Neither of the experts testified that the failure to object was a failure to meet the level of performance required. The State's expert specifically testified that this mistake did not affect the outcome. There was no testimony from Petitioner's expert that it did.

*Pages 35–36*

During Mr. Hauser's testimony, he accused Mr. McNeil of "sabotaging things." When Mr. LaMonda began his cross-examination, one of the first things he asked Mr. Hauser to do was "explain more about" Mr. McNeil sabotaging things. Mr. Hauser took the opportunity to describe several actions he attributed to Mr. McNeil: turning off breakers such that on one occasion food spoiled in a freezer, breaking the washing machine once by stuffing it too full, harassing tenants, yelling in the hallway, calling people names, pushing people off the sidewalk. Mr. LaMonda then asked when such behavior began, and when it became so bad that the landlord felt he needed to do something about it. In Mr. Hauser's response, he stated that he had talked to the police about problems he had had with Mr. McNeil.

Petitioner's expert testified that Mr. LaMonda elicited more "prior bad acts" testimony than the State did, and that it was prejudicial to Mr. McNeil. She did not testify that this deviated from the standard of care of an attorney under the circumstances, or that it affected the outcome. The State's expert testified that Mr. LaMonda was understandably apparently trying to let Mr. Hauser's own testimony undermine his own credibility, and the State's expert implied that there was nothing wrong with that approach. He testified that it was a mistake for Mr. LaMonda to let Mr. Hauser keep going on, particularly by asking "when did this behavior begin?" at line 25, page 36. The State's expert testified that an experienced attorney would have ended the testimony at that point instead of giving Mr. Hauser an opportunity to expand even further, and that it fell below the standard to ask "when" rather than end the line of testimony. He testified that, nonetheless, this mistake did not affect the outcome.

*Pages 40–45*

After asking Mr. Hauser to describe some positive aspects of a "good" relationship with Mr. McNeil (which Mr. Hauser acknowledged and described), Mr. LaMonda specifically asked

3

Mr. Hauser about an altercation between the two in December of 2010 in which Mr. Hauser had called the police. His question ended with "Mr. McNeil ended up with bruises, correct?" Mr. Hauser responded by testifying about the incident and describing Mr. McNeil as the attacker. Mr. LaMonda then asked a number of questions that appeared to be designed to call into question Mr. Hauser's credibility; specifically, "so it's your testimony that in December of 2010, you were attacked by a tenant, and as of March, he was still living there? . . . Did you inform the court [in an eviction case Mr. Hauser had brought against Mr. McNeil] that you had been physically attacked by a tenant? . . . And the court didn't find that important enough to—." Mr. Hauser responded that the police said that it was not enough of an action to press charges. As Mr. LaMonda continued to ask specifics about whether Mr. Hauser had attempted to evict Mr. McNeil due to a physical assault, Mr. Hauser was not able to provide specifics (he testified that it had been a long time), and then said, "Drew was the aggressor all the time. It had gotten to the point where tenants were not staying in the building overnight, they were staying with friends just to avoid being there because Drew was causing so many problems."

At no time did Mr. LaMonda seek to strike Mr. Hauser's testimony. On the contrary, he continued to question Mr. Hauser about whether and what efforts he made to evict him and on what basis. Mr. Hauser mentioned letters that he had written to Mr. McNeil. Mr. LaMonda asked,

Question: "And you've described what you feel was threatening language, especially towards the children?"

Answer: "Yes."

Question: "And I think you used the phrase you better watch your children?"

Answer: "Yeah."

Question: "Is that what you considered to be threatening language."

Answer: "Well, when somebody says to me you better enjoy your son while you can and I'm going to get your son and you better keep an eye on him and I'm out to get him and, you know, is directly physically threatening my son and another tenant's child who's only three years old, yeah, I think that's very clear."

Later, on page 45 of the transcript, Mr. LaMonda asked a question about whether Mr. Hauser was changing his testimony concerning "you better watch your child." In response, Mr. Hauser went on: "Well, because there was a lot more to it. I mean, I'm not trying to, you know, overwhelm her with every example that had taken place over a number of months. I've given her the general impression. But Drew was—I got many calls from—from Cooper's parents, they were very upset, over months that Drew just threatened our kid again, that Drew has just, you know, said rude things to Cooper, that Drew threatened Cooper directly or Drew said threatening

4

things to one of them about Cooper." Mr. LaMonda moved to strike the testimony as hearsay, and the request was denied on the grounds that it was given in response to a question asked by Mr. LaMonda.

*Page 79*

Ms. Blakeney was a witness to the incident and another tenant in the apartment building, and she and Mr. McNeil had known each other before either was a tenant in their current building. They had had a hostile relationship for years, including when both were tenants in another apartment building in the past. She was a witness to the incident, so her credibility was an issue. She spontaneously testified that she had "stacks of letters that he left on my door threatening my child." Mr. LaMonda asked her, "And what sorts of threats to the child?"

Answer: "He threatened to kill the children. Glenn—Cooper, Henry, which is—Henry is Mark's son and Cooper is my son."

Question: "I mean, did he make threats to the extent of you better watch your children?"

Answer: "Yes."

Question: "And aren't those the types of threats that could be you better care for your children better?"

Answer: "No. This was definitely threats."

Mr. LaMonda asked if she had the letters with her and she did not.

Mr. LaMonda acknowledges that he made a mistake in not objecting to both Mr. Hauser's and Ms. Blakeney's testimony about threats to children. Both experts also identified this as a mistake. Petitioner's expert's testimony was that it "doesn't help" with the jury. She did not testify that it fell below the standard of care required of the attorney, or that it affected the outcome. The State's expert testified that Mr. LaMonda should have tried to intervene to stop Mr. Hauser's "runaway train" testimony, but he did not testify that it fell below the required standard of care, and he did not testify that the outcome would have been different.

*Page 114*

During Mr. LaMonda's cross-examination of police officer Anthony Amaral, the officer referred to Mr. McNeil as follows: ". . . the idea that he out and out assaulted with a deadly weapon these individuals and . . . ." Petitioner's expert testified that when Mr. LaMonda did not object to testimony that pepper spray was a "deadly weapon," it was confusing and prejudicial to the jury. She testified that he could have moved for a mistrial, which would not have been granted, or he could have asked for a curative instruction. She did not testify that it fell below the standard required of an attorney in the circumstances, or that it affected the outcome. The State's expert testified that it was a mistake that was prejudicial and directly undermined the self-defense claim for the officer to call Mr. McNeil's use of pepper spray use of a "deadly weapon,"

5

and that Mr. LaMonda should have done something such as move for a mistrial. He was clear, however, that this mistake, either standing alone or considered in conjunction with the other mistakes made during the trial, would have made no difference in the outcome.

The Court finds that Mr. LaMonda adopted a trial strategy that was unusual for the case, but reasonable under the circumstances. It was to let all of the witnesses talk freely, including making accusations against each other that involved hearsay, so that the credibility of all of them would be at issue, and simultaneously provide evidence supporting Mr. McNeil's self-defense claim as the credible testimony. He was surprised by the trial testimony of his client, Mr. McNeil, about how the pepper spraying occurred—that he shot at Mr. Hauser from behind his own back. There was no testimony that anything about this testimony involved a mistake on Mr. LaMonda's part. The State's expert identified this testimony as the key factor in the outcome.

After considering the trial testimony and the testimony of both experts, the court finds persuasive the opinion of Mr. LaMonda's expert that Mr. LaMonda made the five mistakes identified above in the trial, including one that directly undermined the only defense in the case, which was self-defense, and one that fell below the standard of care of an attorney under the circumstances. The balance were within the scope of normal mistakes that could be made in any trial. Considered all together, they do not meet Petitioner's burden of showing that Mr. LaMonda's trial performance fell below the level of reasonable competence as measured by the prevailing standards in the conduct for lawyers conducting a defense under the circumstances of this case.

Moreover, the Court finds that the critical factor in the jury verdict was the testimony given by Mr. McNeil himself, together with the testimony of others present, about exactly how the pepper spraying took place. Even if any of the mistakes, or all of them collectively, were considered to be strong enough that Mr. LaMonda's overall performance fell below the required level of competence, the evidence does not support a finding by a preponderance of the evidence that the outcome would have been different if any or all of those mistakes had not been made.

### Conclusions of Law

The standard for evaluating post-conviction claims of ineffective assistance of counsel is longstanding and well known.

> The appropriate standard for reviewing claims involving ineffective assistance of counsel is whether a lawyer exercised "that degree of care, skill, diligence and knowledge commonly possessed and exercised by reasonable, careful and prudent lawyers in the practice of law in this jurisdiction." To demonstrate ineffective assistance of counsel, a petitioner must show by a preponderance of the evidence

6

that: (1) his counsel's performance fell below an objective standard of performance informed by prevailing professional norms; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the proceedings would have resulted in a different outcome. Unless petitioner is able to satisfy both prongs of the test, "it cannot be said that the conviction or . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable." In making this showing, petitioner cannot rely on the distorting effects of hindsight, and must surpass the strong presumption that counsel's performance fell within the wide range of reasonable professional assistance.

*In re Grega*, 2003 VT 77, ¶ 7, 175 Vt. 631 (citations omitted). As one treatise explains, "Professional canons or ethical standards, such as the American Bar Association (ABA) Standards for Criminal Justice, may be valuable measures of the prevailing professional norms of effective representation, although they are 'only guides' and not 'inexorable commands.'" Brian R. Means, Postconviction Remedies § 35:4 (WL updated July 2014) (footnote omitted). Experts also supply the standards by which deviations may be measured. *Grega*, 2003 VT 77, ¶ 16 ("Only in rare situations will ineffective assistance of counsel be presumed without expert testimony."); see also, e.g., *In re Russo*, 2010 VT 16, ¶ 12, 187 Vt. 367 ("Petitioner's attorney expert witness testified as to the performance of petitioner's trial attorney relative to the professional standards for criminal defense attorneys in Vermont."). "[I]t is important to remain cognizant that [counsel's] performance, *viewed as a whole*, is what matters." *Atkens v. Zenk*, 667 F.3d 939, 945 (7th Cir. 2012) (emphasis in original).

Petitioner's expert testified as to what she viewed as mistakes made by trial counsel. She identified them as tactical errors that he might have handled more effectively in a different manner. The question is not, however, whether in hindsight counsel could have done something better. The issue is whether counsel's performance fell below an applicable, objective standard of competence. Petitioner failed to present evidence, via expert testimony or otherwise, of the norms of the profession, how trial counsel deviated from those norms, and how, as a whole, his performance was ineffective. He also failed to show that there is any probability that the outcome of the trial would have been any different but for the performance deficiencies.

Criticizing trial counsel's performance after the fact is not enough.

It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct,

and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland v. Washington*, 466 U.S. 668, 689 (1984) (citations omitted).

The court is persuaded by the State's expert. The trial strategy chosen by Mr. LaMonda—attempting to induce witnesses into undermining their own credibility by letting them speak more freely than otherwise—had merit and does not represent a failure to meet the standard of care required of a trial attorney. Given the circumstances, the strategy itself was not so unlikely to succeed as to have violated professional standards. See *In re Combs*, 2011 VT 75, ¶ 10, 190 Vt. 559 ("Trial counsel is allowed much discretion in decisions regarding trial strategy, and we will not measure counsel's competence based on the failure of that strategy."). While Mr. LaMonda made some specific mistakes during cross-examination in carrying out this strategy, the mistakes were collectively not significant. On the whole, counsel's performance did not fall outside the realm of professional competence or undermine confidence in the verdict.

In addition, Petitioner's evidence does not establish the second required element: that the outcome would have been "not guilty" but for the performance of Mr. LaMonda as trial attorney. The jurors had Mr. McNeil's own evidence, as well as that of others, about the manner in which he pepper sprayed his landlord. To the extent the jury found this testimony credible, a different trial strategy on the part of Mr. LaMonda would not have affected the outcome.

Petitioner has failed to carry the burden of proof on his claim.

## Order

Mr. McNeil's petition for post-conviction relief is *denied*.

Dated at Montpelier this 5th day of December 2014.

_____
Mary Miles Teachout
Superior Judge