2014 VT 67

# In re Eric Williams

[101 A.3d 151]

No. 12-179

Present: Reiber, C.J., Dooley and Crawford, JJ., and Morse and Burgess JJ. (Ret.), Specially Assigned

Opinion Filed July 11, 2014

40

*Allison N. Fulcher* of *Martin & Associates*, Barre, for Petitioner-Appellant/Cross-Appelle.

*Thomas J. Donovan, Jr.*, Chittenden County State's Attorney, and *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, for Respondent-Appellee/Cross-Appellant.

¶ 1. **Crawford, J.** This post-conviction relief (PCR) case arises from a tragic fire in an apartment house that caused the deaths of three young children and their grandmother. Petitioner, a resident in the same building, pled guilty to four counts of involuntary manslaughter and was sentenced to serve forty to sixty years in prison. He was nineteen years old at the time of the offense.

¶ 2. Petitioner seeks to vacate his conviction on grounds of ineffective assistance of counsel. Following a twelve-day trial, the civil division ruled that although petitioner's defense attorney provided adequate representation in connection with his guilty pleas, the assistance he provided to his client during sentencing fell below minimum standards of representation. Both petitioner and the State have appealed the court's decision. We affirm the court's decision that petitioner failed to demonstrate ineffective assistance of counsel prior to his guilty plea. We also affirm the ruling that his representation during the sentencing phase was inadequate and that he was prejudiced by his attorney's failure to provide more than perfunctory assistance. We agree with the PCR court that petitioner's sentence must be vacated and a new sentencing hearing scheduled.

¶ 3. The fire started at approximately 3:00 a.m. on October 2, 1999 at the Sarah Marie Apartments in Milton, Vermont. It was a

fast-moving fire that originated in the first-floor apartment shared by petitioner and his roommates. It spread to the exterior wooden staircase which served the second-floor apartment. The staircase was destroyed and the upstairs apartment was cut off. The upstairs tenant and her three grandchildren who were staying with her overnight all died.

¶ 4. The police fire investigator concluded that the fire had started in petitioner's room in a wastebasket close to his bed. Petitioner initially denied any responsibility for the fire. In the course of a second police interview, he stated that he caused the fire by lighting paper in his waste basket. His statement provided no explanation of why he might have committed such an act. Petitioner was arrested at the conclusion of the interview. He has been incarcerated since October 4, 1999.

¶ 5. The State originally charged petitioner with four counts of first-degree murder and four counts of arson causing death. Petitioner was assigned a public defender, Eric Selig. Attorney Selig retained a fire expert who examined the entire police file on the fire investigation and found no fault with the investigation or its conclusions.

¶ 6. Attorney Selig also hired a psychologist to evaluate petitioner. After conducting a six-hour examination and interview, the psychologist concluded that petitioner had a relatively low IQ of 86 and limited academic ability. He determined that petitioner was competent to stand trial and was sane at the time of the offense. There were no indications of significant mental illness.

¶ 7. In addition to the two expert witnesses, defense counsel took depositions of numerous witnesses including the investigating officers. One of the fact witnesses deposed was Josh Quesnel, who was in petitioner's ground-floor apartment the night the fire started. Mr. Quesnel recalled in his deposition that shortly after the fire was extinguished, petitioner said to him that the fire "was all [petitioner's] fault" and that "[petitioner] didn't mean for anything, for any of this to happen."

¶ 8. In the fall of 2000, defense counsel filed motions to suppress petitioner's statements to police and to dismiss the arson charges on the ground that there was no evidence of the requisite level of intent. A hearing on both motions was delayed when Attorney Selig took a new job out of state. Public defender Jerry Schwarz entered his appearance for petitioner in December 2000.

Hearings on the pending motions were continued until February 2001.

¶ 9. Before the motions were heard, the parties entered into a plea agreement. The agreement provided for the amendment of the original charges to four counts of involuntary manslaughter. The maximum sentence allowed was fifty to sixty years to serve. The defense was free to argue for a sentence of as little as twenty to sixty years to serve. In February 2001, petitioner entered a guilty plea on all four counts.

¶ 10. Sentencing occurred in May 2001 following submission of a presentence investigation report (PSI). The PSI recommended a sentence of forty to sixty years based on the need for punishment. After hearing arguments by the prosecutor and defense counsel, as well as testimony from the family and friends of the victims and from petitioner, the court imposed a sentence of forty to sixty years in prison. Petitioner subsequently filed this PCR petition.

¶ 11. In January 2012, the PCR court issued a detailed decision. The court concluded that petitioner had not met his burden of proof on the claim concerning his representation prior to the guilty plea. On the issue of sentencing, however, the court concluded that defense counsel had provided no more than a perfunctory performance which fell below the standards required of a criminal defense attorney. The court found that the short-comings in representation were sufficiently serious that they resulted in prejudice to petitioner. It vacated the sentence and ordered a new sentencing hearing for petitioner. Both sides have appealed the PCR court's decision.

¶ 12. We apply a deferential standard of review to the decision of the PCR court. We review factual findings for clear error and will uphold the legal conclusions if they are reasonably supported by the findings and the applicable legal principles. *In re Russo*, 2010 VT 16, ¶ 17, 187 Vt. 367, 991 A.2d 1073.

## I. Ineffective Assistance Prior to Guilty Plea

¶ 13. Petitioner raises three issues concerning his attorney's performance during the period leading up to his guilty plea. First, he contends that defense counsel should have retained a fire expert to conduct an independent cause-and-origin investigation. Second, he contends that the defense should have filed a motion to dismiss three of the four arson charges on grounds of multiplicity. Finally,

he contends more generally that defense counsel should not have advised him to plead guilty.

## A. Fire Expert

¶ 14. The State completed its fire investigation within a day of the fire. Detective Sergeant Hatch concluded that the fire originated in petitioner's bedroom, that it was not an electrical fire caused by a short circuit, and that it started in the area of petitioner's wastebasket. In response, Attorney Selig retained Michael Lane, a fire investigator. Attorney Selig located Mr. Lane through a referral from within the public defender system. He sent Mr. Lane the Hatch report and photos, videos, depositions, and other documentation concerning the fire. In March 2000, Mr. Lane travelled from his office in Putnam, New York to speak with Attorney Selig in person. Mr. Lane told Attorney Selig that he had no criticism of Sergeant Hatch's investigation or of his conclusion that the fire originated in petitioner's wastebasket. At the PCR trial, Mr. Selig testified that he had confidence in Mr. Lane's expertise and conclusions. He was reluctant to hire additional experts because they might "actually help the State's case."

¶ 15. By the time of the PCR trial, a fire investigator with a different view from Mr. Lane had turned up. Douglas Carpenter was originally hired by family members of the victims of the fire to testify in a civil damages case, and was subsequently retained as an expert witness by petitioner. Mr. Carpenter conducted an on-site investigation of the fire in December 2000. His interpretation of the damage pattern led him to conclude that the fire was electrical in origin and had started inside the wall, not in petitioner's wastebasket. After completing his assignment in the civil case, he volunteered to complete a report summarizing his findings which he sent to PCR counsel.

¶ 16. The PCR court concluded that Attorney Selig's decision to cease his search for a fire expert after Mr. Lane offered no criticism of the police investigation fell within the range of reasonable practice. The court noted that there were sound strategic reasons to be cautious about developing expert testimony which favored the State. A site visit could have occurred only with the knowledge of the State, and Mr. Lane had already formed an initial opinion which was unhelpful to the defense. The court observed that a defense attorney who has received one adverse opinion does not have a duty to continue to shop until he locates

an expert witness who agrees with his position. Finally, although the court found merit in both Mr. Carpenter's and Sergeant Hatch's views, he determined that Sergeant Hatch's opinion was more likely correct. On this record, the trial court found no basis for a violation of the lawyer's duty.

¶ 17. ■ ■ We agree with the trial court's analysis. Having hired a competent, experienced expert, a defense lawyer cannot be criticized for accepting that person's opinion. There is no duty to continue to search for someone who will take the other side. See, e.g., *Marcrum v. Luebbers*, 509 F.3d 489, 511 (8th Cir. 2007) ("Where counsel has obtained the assistance of a qualified expert . . . and nothing has happened that should have alerted counsel to any reason why the expert's advice was inadequate, counsel has no obligation to shop for a better opinion."). The fact that petitioner eventually found an expert who offered an opinion more helpful to his position does not demonstrate that defense counsel was ineffective for failing to obtain similar testimony prior to the guilty plea.

## B. Multiplicity of Charges

¶ 18. Petitioner argues that his counsel was ineffective for failing to file a motion to dismiss three of the four arson charges on multiplicity grounds. He contends defense counsel should have argued that because there was only one act of setting a fire, petitioner could only be charged with one count of arson.

¶ 19. At the time the charges were filed, our leading case on the issue of multiple charges for a single course of conduct was *State v. Senna*, 154 Vt. 343, 575 A.2d 200 (1990). In *Senna*, a defendant who took his three victims to the same place at the same time was charged with three counts of kidnapping under 13 V.S.A. § 2401, which imposed penalties on a "person who, without legal authority, forcibly or secretly confines or imprisons another person within this state against his will." *Id.* at 346, 575 A.2d at 202. We held that the defendant was properly charged with three violations of the statute because "[b]y its plain language, the statute defines an act of kidnapping by reference to the victim." *Id.* at 346-47, 575 A.2d at 202.

¶ 20. ■ Petitioner was originally charged with four counts of arson causing death under 13 V.S.A. § 501. Section 501 provides: "A person who wilfully and maliciously burns the building of

another, or wilfully and maliciously sets fire to a building owned in whole or in part by himself, by means of which the life of a person is lost, shall be guilty of murder in the first degree." Like the kidnapping statute at issue in *Senna*, the actions specifically prohibited by the statute are defined by reference to the victim. A defendant may therefore be charged with multiple counts of arson causing death where multiple deaths result from the same act of setting a fire. *Senna* was the controlling authority at the time petitioner was charged. Thus, defense counsel reasonably concluded that a multiplicity challenge to the arson counts would not succeed. Counsel was not ineffective for failing to raise a meritless argument. See *In re Kirby*, 2012 VT 72, ¶ 12, 192 Vt. 640, 58 A.3d 230 (mem.) (holding that in light of existing case law at time of defendant's conviction, it was reasonable for counsel to doubt the merit of asserting a multiplicity challenge to multiple charges of possession of child pornography).

¶ 21. Our more recent decisions in *State v. LaBounty* and *State v. Martin* do not demonstrate that counsel had a viable argument for dismissing the multiple counts of arson in this case. In *LaBounty*, the defendant was charged with two counts of grossly negligent operation when he lost control of his vehicle while speeding, resulting in serious bodily injury to his two passengers. We held that when the statute did not explicitly address whether an operator is guilty of multiple offenses when multiple injuries occur, the decisive question was "whether the actus reus prohibited by the statute is the act of driving negligently, which defendant committed only once, or the act of causing serious injury, which defendant committed twice." 2005 VT 124, ¶ 6, 179 Vt. 199, 892 A.2d 203. Because the statute defined the crime of grossly negligent operation solely by reference to the standard of care of the driver, we held that it was plain error for defendant to be charged and convicted with two violations of the statute. *Id.* ¶ 10. Similarly, in *Martin*, we held that the defendant could not be convicted of two counts of boating while intoxicated arising from a single accident resulting in two deaths because the act prohibited by the statute was defined solely by the operation of a vessel while intoxicated and not by the consequences. 2007 VT 96, ¶ 56, 182 Vt. 377, 944 A.2d 867. Neither of these decisions displaced our ruling in *Senna*. Both involved statutes that prohibited certain acts without reference to the consequences of the prohibited acts. See *Martin*, 2007 VT 96, ¶ 55 (distinguishing *Senna*); *LaBounty*,

2005 VT 124, ¶ 7 (same). The arson statute at issue here is plainly in a different category because it explicitly makes reference to the victim, like the kidnapping statute at issue in *Senna*. It was reasonable for defense counsel to conclude that a multiplicity challenge would be unlikely to succeed.

## C. Advice to Plead Guilty

¶ 22. ■ Petitioner claims that defense counsel was ineffective in advising him to plead guilty without having adequately investigated or otherwise challenged the State's arson case. Ineffective assistance of counsel at the plea-bargain stage may invalidate a conviction. *In re Plante*, 171 Vt. 310, 313, 762 A.2d 873, 876 (2000); see also *Von Moltke v. Gillies*, 332 U.S. 708, 721 (1948) ("Prior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered."). Petitioner argues that if counsel had tested the State's case more vigorously by hiring an independent fire sciences expert and filing a motion to dismiss on multiplicity grounds, he would have been in a stronger negotiating position and could have gotten a better plea bargain.

¶ 23. ■ The PCR court rejected petitioner's argument. It held that petitioner's attorneys adequately prepared the case and therefore Attorney Schwarz was not ineffective for advising petitioner to plead guilty based on that preparation. The court's conclusion is supported by its findings. The record shows that defense counsel devoted significant time and attention to the case prior to the change of plea. Attorney Selig conducted numerous depositions. He retained the services of a fire investigator and a psychologist, neither of whom was able to offer information helpful to the defense. He filed motions to suppress petitioner's confession to police and to dismiss the arson charges. He kept petitioner informed of developments in the case. When he withdrew from the case, he turned over his materials to Attorney Schwarz, an experienced public defender who worked in the same office.

¶ 24. Upon taking over the case, Attorney Schwarz reviewed all of the materials prepared by Attorney Selig. He believed that the evidence against petitioner was strong. Attorney Schwarz and his investigator met with petitioner in February 2001 to discuss the case and a potential plea offer. Attorney Schwarz discussed with

petitioner in detail the facts and the legal issues of the case. He discussed the possible guilt of a third party, the likelihood of success of the pending motions, the possibility of a conviction on the original murder charges, and petitioner's potential release if he received less than a mandatory life sentence. Based on his review of the case file, Attorney Schwarz recommended that petitioner accept the State's offer to plead guilty in exchange for amending the charges to involuntary manslaughter. We agree with the PCR court that petitioner has not demonstrated that counsel failed to sufficiently prepare the case prior to the plea or failed to provide informed advice about whether to plead guilty.

## II. Sentencing

¶ 25. ■ Petitioner's claim of ineffective assistance of counsel at sentencing has two elements. Petitioner bore the burden of proof that his representation fell short of professional standards and that it is reasonably probable that his sentence would have been less if he had received appropriate representation. *In re Kimmick*, 2013 VT 43, ¶ 16, 194 Vt. 53, 72 A.3d 337 (citing *Strickland v. Washington*, 466 U.S. 668, 691-94 (1984)).

¶ 26. The PCR court found that the defense attorney's efforts at sentencing were perfunctory and fell short of professional standards of representation. It found that counsel failed to conduct a thorough investigation of petitioner's background or to prepare for and present an effective sentencing presentation. This finding was supported by expert testimony provided by Attorney Richard Rubin. In his opinion, counsel's representation at sentencing constituted "a gross deviation from the standard of care." The expert called by the State, Attorney Volk, offered minimal support for counsel's performance at sentencing. Attorney Volk testified that "I would, as I've informed you, indicate that there are certainly — and I hesitate to use the term better ways to have proceeded — but having said that, I am not — it is not my opinion that the way that he chose to proceed violated either of the *Strickland* prongs." The PCR court stated that it "did not sense much confidence" in Attorney Volk's testimony on this point.

¶ 27. ■ Both Attorney Rubin's opinion and the decision of the PCR court are supported by the record. The sentencing hearing was dominated by the statements of bereaved family members and friends who described their grief over the loss of the three

children and their grandmother as well as their desire for the maximum penalty. Defense counsel called no witnesses who could describe petitioner in a more favorable light. Nor did he file a sentencing memorandum in advance of the hearing that would allow him to present his arguments for the minimum sentence in a less hostile and emotionally-charged environment. Instead, he offered a few remarks about petitioner's childhood, essentially repeating the information in the PSI.

¶ 28. As the PCR court noted, there is no evidence in the record that counsel had strategic reasons not to conduct any independent investigation, present testimony, or prepare a sentencing memorandum. See *Strickland*, 466 U.S. at 690 (noting that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). Under these circumstances, we conclude that the PCR court's finding that petitioner did not receive adequate assistance of counsel is supported by the evidence. We turn now to the second element of petitioner's claim — proof of prejudice.

¶ 29. ■ Under *Strickland*'s second prong, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694; see also *In re Pernicka*, 147 Vt. 180, 183, 513 A.2d 616, 618 (1986). The great difficulty with proving actual prejudice to the defendant at sentencing is that it can only be met through evidence about something which did not occur. The PCR judge cannot ask the sentencing judge if the sentence would have been different if he or she had heard a more effective presentation from the defense. See, e.g., *Perkins v. LeCureux*, 58 F.3d 214, 220-21 (6th Cir. 1995) (petitioner cannot prove that counsel's ineffective assistance prejudiced his defense using testimony of sentencing judge; risk of inaccuracy outweighs probative value of testimony, and inquiry into judge's mental processes undermines judicial immunity, comity, independence and finality of judgments). Instead, the PCR court must determine whether there is sufficient circumstantial evidence to support a finding that there is a reasonable probability that the weakness in petitioner's defense altered the outcome.

¶ 30. In reviewing the PCR court's decision on the issue of prejudice, we first consider whether the court applied the correct

legal standard. We then consider whether the evidence in the record supports the court's conclusion that defense counsel's performance was sufficiently prejudicial to require resentencing.

¶ 31. The PCR court applied two different standards to this case. The PCR court initially found that "counsel's efforts in this case were so lacking that prejudice can be presumed." It relied on the U.S. Supreme Court's ruling in *United States v. Cronic*, in which the Court held that there was an exception to the need to demonstrate prejudice resulting from counsel's deficient performance in cases where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." 466 U.S. 648, 658-59 (1984). In its subsequent decision on the State's motion for reconsideration, the PCR court stood by its earlier ruling that counsel's performance was presumptively prejudicial to petitioner. However, the court also ruled that petitioner had demonstrated "actual prejudice" and therefore met the burden of proof on this basis as well.

¶ 32. ■ The PCR court erred by applying the *Cronic* standard of presumptive prejudice to this case. As the U.S. Supreme Court emphasized in *Bell v. Cone*, the *Cronic* exception is a very narrow one and applies only in cases where counsel completely fails to provide representation. 535 U.S. 685, 696-97 (2002). In *Bell*, the defense attorney provided minimal assistance in the sentencing phase of a capital murder case. He interviewed no witnesses relevant to sentencing, presented no mitigation testimony from the available witnesses, made no plea for petitioner's life, and offered no closing remarks. Despite these shortcomings, the Court held that petitioner had not shown that his attorney "failed to oppose the prosecution throughout the sentencing proceeding as a whole," only that he "failed to do so at specific points." *Id.* at 697. The Court held that in the absence of a complete failure by counsel to represent the defendant, a claim of ineffective assistance which is based upon specific attorney errors must meet the *Strickland* requirement of a showing of actual prejudice. *Id.* at 698.

¶ 33. Like the attorney in *Bell*, petitioner's counsel did not entirely fail to represent him at the sentencing proceeding. While counsel's representation fell below the standard required of a reasonable attorney, it was not "tantamount to non-representation." *United States v. Theodore*, 468 F.3d 52, 57 (1st Cir. 2006). The shortcomings in counsel's performance identified by petitioner are

specific failings that are more appropriately analyzed under the *Strickland* standard of actual prejudice. See *id.* at 57-58; *Scarpa v. Dubois*, 38 F.3d 1, 13 (1st Cir. 1994) (noting that "bad lawyering, regardless of *how* bad, does not support the per se presumption" (quotation omitted)).

¶ 34. ▮▮▮ We turn now to the question of whether the PCR court correctly applied the *Strickland* standard of prejudice. The *Strickland* decision derived the requirement of a showing of prejudice from the underlying purpose of the Sixth Amendment guarantee of counsel, which is to ensure that "a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." 466 U.S. at 692. In defining this standard, the Court ruled out two alternative standards. A mere showing that attorney error had "some conceivable effect on the outcome" is insufficient. *Id.* at 693. On the other hand, the petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* The first standard would be met whenever there was an attorney error, and the second standard places the burden too high since errors may render the result of a case unreliable even in the absence of proof that they determined the outcome. *Id.* at 693-94. The Court identified the correct test for prejudice as "a reasonable probability" of a different outcome. *Id.* at 694. We have followed the *Strickland* holding in our own decisions. See *Pernicka*, 147 Vt. at 183, 513 A.2d at 618.

¶ 35. In its decision on the motion for reconsideration, the PCR court concluded its analysis by deciding that "there may indeed have been actual prejudice to [petitioner] in the lack of advocacy on the part of his attorney." The court identified several specific factors in support of this conclusion: (1) since the sentencing judge was given broad discretion under the plea agreement, it was essential for defense counsel to advocate strongly for the lower minimum; (2) the plea agreement embodied the recognition of both sides that petitioner had no criminal intent to cause loss of life; (3) there was no sentencing memorandum to explain and provide a supporting argument for the twenty-year minimum; (4) the defense failed to interview available witnesses and expand upon the statements in the PSI; (5) the sentence was comparable to a sentence for murder; and (6) without a sentencing memorandum, there was nothing to support the judge should he wish to consider a minimum sentence of less than forty years, the amount recommended in the PSI. With this "barren record" of attorney

performance in mind, the trial court found that there was sufficient evidence of prejudice to meet the *Strickland* requirements. We review the same evidentiary record in order to determine whether the evidence at the PCR hearing was sufficient to support the court's conclusion.

¶ 36.　■■■■ In reviewing these findings, we start with the essential purposes of the sentencing process. This Court has identified four goals of sentencing: punishment, prevention, rehabilitation, and deterrence. See *State v. Ingerson*, 2004 VT 36, ¶ 13, 176 Vt. 428, 852 A.2d 567 (citing *United States v. Giraldo*, 822 F.2d 205, 210 (2d Cir. 1987) ("The proper purposes of the sentencing of criminal offenders are generally thought to encompass punishment, prevention, restraint, rehabilitation, deterrence, education, and retribution.")); *State v. Corliss*, 168 Vt. 333, 342, 721 A.2d 438, 445 (1998) (affirming sentencing court's consideration of traditional common law factors of punishment, deterrence, and rehabilitation).

¶ 37. This case presented an unusual problem for sentencing because by all measures but one the crime would have resulted in a low or moderate sentence. Petitioner was young — nineteen years old at the time of the offense — and had no prior criminal record. The facts concerning his background and behavior prior to the offense were positive: a high school graduate, employed, connected with friends and family, and with vocational plans. The amended charges of involuntary manslaughter were general intent crimes, and there was no claim by the State at sentencing that petitioner had any specific intent to cause harm to the victims or to others. In one respect, however, the crime was horrific. It resulted in the deaths of three children and their grandmother — people who scarcely knew petitioner and had the misfortune of sleeping in the apartment above his. Their family's sense of loss and anger were strongly expressed at the sentencing hearing.

¶ 38. The task faced by the defense in balancing the loss experienced by the victims and their families with the relatively low level of criminal conduct — measured both by petitioner's lack of prior history and the reduced level of criminal intent — is present in many cases in which the crime arises from grossly negligent conduct. Defendants who are in general law-abiding people can cause death and great damage through incidents of thoughtlessness, intoxication, or loss of self-control. Defense coun-

sel knew before sentencing that it would be necessary to take time to develop petitioner's side of the sentencing issue. At petitioner's change-of-plea hearing, he advised the court that he had several witnesses and anticipated a half-day hearing, including the State's presentation. Yet he failed to follow through on this at sentencing.

¶ 39. Prior to sentencing, petitioner participated in the presentence investigation which resulted in a PSI report. The report includes statements from the victims' families, a social history of petitioner, and interviews with petitioners' relatives, employers, a foster mother, and an employer, all of whom had favorable things to say about petitioner. The summary reviewed the points in petitioner's favor — his lack of a criminal record, absence of drug or alcohol use, his graduation from high school as a foster child, his remorse, his efforts to get people out of the burning building, and his description by people who knew him "as a good person, a hard working person, and a person who they would not expect to have committed an offense such as this." It also summarized the desire of the victims' relatives for a lengthy sentence due to their belief "that a lesser sentence would not be commensurate with the loss of four lives." The PSI recommended a sentence of forty to sixty years to serve.

¶ 40. The PSI defined the parameters of the ethical dilemma presented by the sentencing decision. A good person had committed an offense without intending harm that had terrible consequences. There were at least five people who spoke in favor of petitioner to the PSI investigators. There were at least as many people who had experienced grief and bereavement as a result of his actions. In the face of this challenge, petitioner's attorney did nothing except to appear at sentencing to offer a few commonplace remarks.

¶ 41. The result of defense counsel's failure to provide testimony about petitioner's positive characteristics was that the sentencing hearing was largely one-sided. From the opening statement of the prosecutor, through the statements of the family members, and concluding with the sentencing judge's own statement, the only element of the sentencing decision to receive substantial consideration was retribution. Each participant, including defense counsel, presented this issue as the need to measure the value and duration of the four lives lost against the long period of years to be served by petitioner.

¶ 42. The prosecutor requested a sentence of fifty to sixty years. He explained the minimum period as representing twelve-and-a-half years to serve for each of the deceased. He described the intentional aspect of petitioner's conduct in setting his wastebasket on fire. He compared the years of life denied to the victims with the life remaining to petitioner after his release from prison. He argued that the maximum sentence would deter others from acts of gross negligence. He concluded by stating that "this is ultimately a sentence that would punish this man for taking four lives." The prosecutor's statement fairly stakes out one side of the sentencing argument. No one contends that it was improper. It is a traditional statement of the retributive purpose of sentences in cases involving death or grave injury.

¶ 43. This theme that the loss of the victims' lives requires severe punishment was echoed in the statements of the family members who were generally unsatisfied with the maximum penalty in the plea agreement. Six family members or family friends spoke. The first person to speak stated that he believed "that [petitioner] should never see the light of day again." The second person, a child, stated that "I know [petitioner] is young. He deserves more than the max." The third stated that "I really want as many years as possible given to this young man." The fourth and fifth speakers described the family's suffering. The sixth person to speak was the children's mother. She stated:

> I wish for [petitioner] that if something could be done to him that's not a law in Vermont. It's not allowed. I know that he's a young man, but he took away my children and my mother. He turned my whole life upside down and my daughter's and I just ask that you would consider giving him the max, sixty years or life, because our lives are ruined . . . I don't think he should have the right to fulfill any of his dreams when we can't and they can't either.

These are understandable comments from people who have suffered greatly. Like the prosecutor's statement, they are located at one extreme of the sentencing debate.

¶ 44. As we have observed already, the defense offered almost nothing of substance in petitioner's defense. The defense attorney noted that the PSI offered "a fairly accurate picture of the tragic facts in this case, a good decent kid commits an unlawful act

which results in the unintentional deaths of four innocent people." He reviewed petitioner's social history and reputation as "a good and decent kid" who had suffered abuse at the hands of his stepfather. He identified the "room for both punishment and rehabilitation" in the sentence and requested the minimum sentence under the plea agreement. As the PCR court pointed out, "[t]here was little, if any, *functional* difference between the State's sentencing presentation and the defense's."

¶ 45. Petitioner spoke extremely briefly. His entire remarks were:

> Yes, Your Honor. I'd just like to let you know that because of my stupidity I killed four people. Kids that aren't going to graduate high school or do things that I've been able to do. I'm very remorseful, and if I could turn back the time to bring these kids back and bring the grandmother back I would, Your Honor. I'd do it in a heartbeat. I'm just very sorry for my actions. That's all, Your Honor.

¶ 46. The sentencing judge recognized that the family's loss was terrible and that there was little he could do to relieve their suffering. He also stated:

> On the other hand, we have a defendant who's a very young man. He's barely more than a boy himself. He has no criminal record, and the act was not one of intentional murder, but it was an intentional act and one that he knew or certainly should have known was very likely to cause death . . . .

The judge stated that it was his job "to try to balance these factors and balance the interest of society and come up with a sentence that is fair and reasonable."

¶ 47. He spoke about the reasons for his sentence. There were two: general deterrence and retribution. The sentencing judge questioned whether general deterrence was particularly effective in deterring crimes based on gross negligence or thoughtless conduct. He described his philosophy of punishment in the following terms:

> The other aspect [of the sentence] is consequence. I prefer not to think of it as punishment as such, although certainly that's an aspect of it, but there's no getting

away from the fact that four innocent lives were taken. They were taken through an intentional act, although it was not the defendant's intent to kill, but there must be a consequence for that, and it must be a serious consequence. It would demean the seriousness of the offense and the value of the victims' lives if the consequence was insufficiently severe frankly.

As these statements indicate, the content of the sentencing discussion from the PSI through the judge's statement was almost entirely dictated by concerns of retributive justice. The critical issue for the author of the PSI, the prosecutor, the family members, and the judge was the need to offset the loss of life by the victims with a commensurate loss of years by petitioner.

¶ 48. ▆▆▆ We agree with the PCR court that the defects in defense counsel's performance were sufficient in their seriousness and in their probable effect on the court to support a finding of actual prejudice. In reaching its decision, the PCR court relied on four main factors: the highly unusual gap between the minimum sentences of twenty and fifty years allowed by the plea agreement; the need to give the sentencing judge reasons to impose a sentence at the low end of the permitted range; the need to develop the positive information about petitioner which appeared in a brief sketch of a few pages in the PSI; and the need to stand up to the strong emotional feelings present in the courtroom. Each of these would be a matter of concern; collectively, they are fundamental errors sufficient to undermine confidence in the fairness of the sentencing hearing. For these reasons, we agree with the PCR court that the sentence must be vacated and the case set for resentencing.

¶ 49. In order to prevent any possibility of inadvertent prejudice or any appearance of unfairness to either side, we require that upon remand resentencing occur before a judge who was not the original sentencing judge. *State v. Koons*, 2011 VT 22, ¶ 16, 189 Vt. 285, 20 A.3d 662; *State v. Neale*, 145 Vt. 423, 436, 491 A.2d 1025, 1033 (1985); *In re Meunier*, 145 Vt. 414, 423, 491 A.2d 1019, 1025 (1985); *State v. Williams*, 137 Vt. 360, 365, 406 A.2d 375, 377 (1979).

*Affirmed.*

¶ 50. **Burgess, J. (Ret.), Specially Assigned,** dissenting in part. I respectfully dissent from the majority's unfounded presumption

that petitioner was prejudiced by his counsel's performance at the sentencing hearing. Assuming, without agreeing under the circumstances here, that defense counsel's advocacy fell short of an effort reasonably expected,[1] petitioner failed utterly to demonstrate that, but for counsel's shortcomings, there was "a reasonable probability" of a different result. *Strickland v. Washington*, 466 U.S. 668, 694 (1994).

¶ 51. That the majority sua sponte and summarily disqualifies the sentencing judge upon remand suggests more concern with petitioner's sentence (not claimed to be an abuse of discretion, and for which reconsideration "in calm reflection" under 13 V.S.A. § 7042 was available, *State v. Therrien*, 140 Vt. 625, 627, 442 A.2d 1299, 1301 (1982), but never sought) than with the quality of his lawyer's tactics or advocacy (to which no prejudice can be attributed).[2]

---

[1] Adopting petitioner's expert's criticism of defense counsel's performance as its own, the PCR court focused on counsel's failure to develop more of a positive personal history or sentencing memorandum on petitioner's behalf, and defense counsel's lack of "feeling," "heart," or "passion" in presenting essentially the same information in abbreviated form to the sentencing court. Neither petitioner's expert nor the PCR court, however, posited what such mitigating or flattering information might have been that was not already known to the sentencing court through the PSI and counsel's representations. The balance of his performance faulted as dispassionate, then, amounts to little more than faulting defense counsel for lack of drama. Whether an infusion of theatrics might have influenced a more lenient sentence in this particular case defies measurement. Of course, casting sympathy on petitioner carried its own danger, given his acknowledged responsibility for killing three children and their grandmother due to a patent disregard of an obvious and likely catastrophe. That such a potentially quixotic tactic could backfire, particularly in the presence of the surviving family members and absent any additional articulable sympathetic facts, arguably posed no less risk than defense counsel's more humble approach. See *Strickland*, 466 U.S. at 689 (explaining that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight," and defendant must overcome the "presumption that, under the circumstances, the challenged action might be considered sound trial strategy" (quotation omitted)). Thus, *Strickland* directs attention to the available "facts" of a case, and to steer clear of assessing appeals to emotion in determining professional competency. *Id.* at 689-90.

[2] The cases cited in support of assigning a different judge to avoid "inadvertent prejudice" at resentencing are quite inapposite. All are premised on the original sentencing judge having considered or relied on purported facts or invalid claims improperly presented. See *State v. Koons*, 2011 VT 22, ¶ 16, 189 Vt. 285, 20 A.3d 662 (holding that trial court's reliance on undisclosed acquitted conduct was kind

¶ 52. As noted by the majority, a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *In re LaBounty*, 2005 VT 6, ¶ 7, 177 Vt. 635, 869 A.2d 120 (mem.) (quotation omitted). In the sentencing context, this requires a reasonable probability that petitioner would have received a different sentence. *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (per curiam). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112, 131 S. Ct. 770, 792 (2011) (citing *Strickland*, 466 U.S. at 693). It was for petitioner to declare what about his life and circumstance was neglected by defense counsel that could have made a difference to the sentencing court. See *In re Dunbar*, 162 Vt. 209, 216 n.*, 647 A.2d 316, 322 n.* (1994) (recognizing that to establish prejudice from counsel's deficient performance, petitioner bears "burden of affirmatively showing what the potential evidence would have been and how it would have produced a different result").

¶ 53. In this case, petitioner failed to articulate, and the PCR court failed to identify, any favorable evidence or balancing portraiture omitted by defense counsel. If there was some more pro-social history or a positive light that might have led to a different sentencing result, petitioner offered nonesuch. Indeed, the PCR court recognized that the "defense did manage to get the mitigating factors in the PSI before the sentencing judge and that it was likely a complete list." Moreover, the PCR court

---

of error that might impair integrity of judicial process and tarnish its reputation for fairness, and thus defendant's sentence was vacated and case remanded for resentencing before different judge) (citing *United States v. Craven*, 239 F.3d 91, 103 (1st Cir. 2001) (holding that, where sentencing court improperly relied on undisclosed information, sentence must be vacated and cause remanded for resentencing before a different judge "to maintain the perception of impartiality") (additional citations omitted)); *In re Meunier*, 145 Vt. 414, 423, 491 A.2d 1019, 1025 (1985) (finding that prosecutor breached plea agreement by advocating for particular sentence at sentencing hearing, and matter would be remanded for resentencing before a different judge "[i]n order to insure no inadvertent prejudice"); *State v. Neale*, 145 Vt. 423, 436, 491 A.2d 1025, 1033 (1985) (holding that, where sentencing court improperly relied on hearsay evidence in imposing sentence, the Court would remand the case for resentencing before a different judge); *State v. Williams*, 137 Vt. 360, 365, 406 A.2d 375, 377 (1979) (where improper hearsay evidence presented at sentencing concerning criminal acts for which defendant was never charged or convicted, matter reversed and remanded for resentencing before different judge). There is no such contaminating influence here, and the original judge is no less qualified than any judge to impose a sentence informed by whatever new approach by a new defense counsel is imagined by the majority.

confirmed that petitioner had not presented evidence "as to precisely what additional material would have turned up" in further investigation. The majority does not contradict what the PCR court established: that regardless of their shared perception of defense counsel's shortcomings, the sentencing court was deprived of nothing that could have made a difference in the outcome. That defense counsel's performance resulted in no actual prejudice to petitioner is beyond cavil.

¶ 54. Identifying no prejudice in fact, the PCR court resorted, instead, to presuming prejudice under *United States v. Cronic*, 466 U.S. 648 (1984), allowed in instances where defense counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.* at 659.[3] This exemption from *Strickland's* required proof of prejudice is, however, extremely narrow and inapposite here. As reiterated in *Bell v. Cone*, 535 U.S. 685, 696 (2002), the *Cronic* exception applies only to extreme situations as when defense counsel is denied altogether, absolutely fails to advocate or is thrust into circumstances by the trial court that defeat any competent representation. Before absolving petitioner of the need to prove his case, the critical inquiry is not whether his counsel could have done something more or differently, but whether counsel did nothing at all in his defense. *Id.* at 696-97 (explaining that proof of actual prejudice could not be avoided under *Cronic* when petitioner argued not that his lawyer "failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points").

¶ 55. The lack of performance claimed here — low-keyed advocacy and failure to develop additional mitigating information — are practically indistinguishable from similar failings claimed,

---

[3] The majority's recitation that counsel's performance resulted in "actual prejudice," *ante*, ¶ 48, is just not supported by the PCR court's decision or by the record. Although it opined on reconsideration "that there may indeed have been actual prejudice" to petitioner "in the lack of advocacy on the part of his attorney," no prejudice in fact was found by the PCR court. The PCR court considered the lack of a witness list and no sentencing memorandum to be "a barren record" prejudicial per se, but this was not supported by any evidence either. It is undisputed that counsel advocated on behalf of petitioner — certainly more than the utter nonfeasance necessary to trigger presumed prejudice, and nothing in the record supports the notion that defense counsel failed to marshal actual mitigating evidence that could or should have been before the sentencing court. The undisputed evidence was that counsel and the PSI raised whatever mitigating facts there were, and petitioner pointed to no neglected evidence.

but still requiring proof of actual prejudice to justify PCR, in *Bell*. *Id*. at 697-98 (noting that "aspects of counsel's performance challenged by respondent — the failure to adduce mitigating evidence and the waiver of closing argument — are plainly of the same ilk as other specific attorney errors we have held subject to *Strickland*'s performance and prejudice components"). For petitioner and the PCR court to prevail in their presumption of prejudice without evidence of same, the "attorney's failure must be *complete*," as in "entirely" failing to contest the State's presentation at sentencing. *Id*. at 697 (quotation omitted and emphasis added).

¶ 56. There was no such wholesale failure here. The majority is inaccurate in saying that "the defense offered almost nothing of substance in petitioner's defense." *Ante*, ¶ 44. Defense counsel argued to the sentencing court that mitigating factors in this case outweighed the aggravating ones, and counsel highlighted all available mitigating factors. Counsel emphasized that petitioner was "a good decent kid" who had committed an unlawful act that resulted in the unintentional deaths of four innocent people. He recounted the circumstances of petitioner's childhood, explaining that petitioner had been abused by his stepfather and placed in state custody as a result. He noted that despite spending over seven years in state custody, petitioner had no drug, alcohol, or delinquency problems. It was pointed out that petitioner graduated from a technical program and was steadily employed. Counsel portrayed petitioner as a foster-care success story who was well-liked by others.

¶ 57. Counsel emphasized petitioner's youth and the tough road that he had endured during his nineteen years. Counsel explained that those who had worked with petitioner in the foster care system had seen signs of depression, problems with self-esteem, and problems with impulse control. Nonetheless, petitioner had no criminal record of any kind before this offense. Since being incarcerated, petitioner was attending classes and working in the kitchen. He had no disciplinary violations and was sending money home to help support his siblings.

¶ 58. Counsel also noted that at the time of the offense petitioner was depressed over the breakup with his girlfriend caused by his best friend. Counsel added that petitioner took full responsibility for his actions and, in doing so, saved everyone the trauma of a protracted trial. Petitioner accepted the fact that,

given the agreed-upon 60-year maximum, he would, for all practical purposes, be under the supervision of the Department of Corrections for the rest of his life. Counsel reiterated that petitioner did not intend to kill anyone, and that he had helped as best he could to get others out of the burning apartment building.

¶ 59. Finally, counsel pointed to petitioner's "deep and genuine remorse" for the pain his actions had caused. Counsel maintained that all of these mitigating factors outweighed the aggravating factors in this case, particularly in light of the fact that the deaths were unintended. Counsel posited that the imposition of a twenty-year minimum — thirty years less than allowed by plea agreement and recommended by the State — accorded both punishment and rehabilitation, and that this was not the kind of case that lent itself to deterrence. Petitioner also testified at the sentencing hearing, taking responsibility for his actions and their consequences, and expressing remorse and regret.

¶ 60. This is no record "barren," as the PCR court erroneously characterized it, of any proposed justification for a sentence below the State's fifty year minimum recommendation. All of petitioner's "positive" attributes were noted in the PSI and by petitioner's attorney. The same positives were known to the court. The PCR court found this as fact, recognizing that trial counsel asserted mitigating factors in the PSI before the sentencing judge and that there was likely nothing to add. Moreover, the record reflects that the sentencing court considered defense counsel's argument in reaching its decision.

¶ 61. Albeit brief, counsel's presentation left nothing available unsaid. No law obligates counsel to engage in redundancy, or to develop witnesses with nothing helpful to offer. If any material information was omitted by counsel, only petitioner knows so and he offered nothing on that account. That a different judge may prefer a different sentence, or a different attorney might have pursued a different tactic, does not render the lawyer's presentation prejudicial or the court's sentence invalid. Nor can I agree with the majority that, absent any evidence of prejudice, the same tactic somehow amounts to "actual prejudice" per se. *Ante*, ¶ 48.

¶ 62. Most telling on this point is the evident inability of petitioner, the PCR court, and the majority here, to recite anything omitted by counsel that could have made a difference. Whatever we think of the sentence, this shortcoming is fatal to petitioner's argument. It is not for the PCR court or this Court

to cancel petitioner's burden of proof. See *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir. 1987) (stating that, for claims of prejudice that rest on counsel's failure to investigate, petitioner must make "a comprehensive showing as to what the investigation would have produced," and focus of inquiry "must be on what information would have been obtained from such an investigation and whether such information . . . would have produced a different result" (quotation omitted)); *Outten v. State*, 720 A.2d 547, 552 (Del. 1998) (recognizing that a defendant "must make specific allegations of actual prejudice and substantiate them" (quotation omitted)); *Conahan v. State*, 118 So. 3d 718, 730-31 (Fla. 2013) (rejecting argument that counsel was ineffective for failing to adequately investigate and present mitigation evidence in penalty phase, explaining that petitioner failed to present any additional mitigation evidence in post-conviction review proceeding, or identify any experts or witnesses that would have been available that counsel failed to present).

¶ 63. The facts of *Outten* are illustrative. In *Outten*, as in this case, the petitioner alleged that counsel was deficient in his presentation of mitigation evidence during the penalty phase. The court found that the petitioner made only conclusory allegations that uncalled witnesses would have influenced his sentence, but failed to identify those witnesses or their potential testimony. "That other witnesses might have been available, alone, is insufficient to prove ineffective assistance of counsel," the court explained, and it refused to "speculate on what testimony these other witnesses might have presented." 720 A.2d at 553 (quotation omitted). So, too, in the instant case, we cannot fault defense counsel for failing to "develop the positive information about petitioner," *ante*, ¶ 48, without a showing of what the additional positive information was. In *Outten*, the court concluded that the petitioner failed to show what actual prejudice was suffered from his claim of counsel's failure to investigate and present these witnesses. 720 A.2d at 553; see also *Page v. State*, 995 A.2d 934, 947-48 (R.I. 2010) (rejecting argument that counsel was ineffective at sentencing hearing, and finding that defendant failed to point to any significant mitigating evidence not provided to trial court through the presentence report and also failed to identify any additional information that might have been obtained through further investigation).

¶ 64. Petitioner proffers nothing to justify the majority's free ride. As the U.S. Supreme Court makes clear, it "is not enough

for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Rather, petitioner must show that, but for counsel's shortcomings, there was a reasonable probability of a different result. *Id.* at 694. In *Strickland*, the Court concluded that the petitioner failed to meet this standard, finding "[t]he evidence that respondent says his trial counsel should have offered at the sentencing hearing would barely have altered the sentencing profile presented to the sentencing judge." *Id.* at 699-700. We cannot even go so far in this case, as no missing evidence is identified at all. The PCR court's remand should be reversed in light of undisputed proof that defense counsel did not roll over and play dead for the prosecution as required for presumed prejudice under *Cronic* and *Bell*, and for petitioner's absolute failure to prove any prejudice in fact from counsel's conduct of petitioner's defense.