Alok Ahuja, Judge
Following a jury trial, Henry Lee Polk Jr. was convicted in the Circuit Court of Clay County of murder in the first degree, armed criminal action, robbery in the second degree, and domestic assault in the second degree. After we affirmed his convictions on direct appeal, Polk filed a motion for postconviction relief under Supreme Court Rule 29.15. Polk's motion argued that his trial counsel was ineffective in multiple respects, and that he was accordingly entitled to a new trial. The circuit court denied relief following an evidentiary hearing. Polk appeals. We affirm.
Factual Background[1]
In October 2003, Stephen Nolte and his wife moved out of their residence at 5519 North Troost in Kansas City, and into a new home. The Troost residence needed renovations before being advertised for sale. On the evening of March 7, 2004, Nolte was working at the Troost residence. At 9:45 p.m., he told his wife that he would return to their new home shortly.
*812 Around midnight, Polk asked his wife[2] to drop him off at the Troost residence so he could speak to Nolte about collecting money that Nolte allegedly owed to Polk. Polk's wife dropped him off in front of the Troost residence and then returned home. At approximately 1:15 a.m., Polk phoned his wife and told her that he and Nolte were going into Kansas to buy beer. Within half an hour, Polk phoned his wife again, and asked her to pick him up in Kansas. On the way home, Polk again asked his wife to drop him off at the Troost residence so that he could talk with Nolte. After dropping Polk off at the Troost residence, his wife returned home. An hour later, Polk phoned his wife and asked for another ride home. Shortly after returning home, Polk once again asked his wife to drive him to the Troost residence so he could get Nolte's truck and sell some of the tools that Nolte kept in the bed of the truck. When Polk's wife suggested that Nolte would probably call the police, Polk responded that Nolte "wouldn't be saying anything to anybody." When the couple arrived back at the Troost residence, Polk put on a pair of gloves, entered Nolte's truck, and told his wife to follow him into Kansas, where he removed the license plates from the truck and abandoned it.
Later in the morning of March 8, 2004, Nolte was found dead in the Troost residence. He had a gaping sharp force injury to his neck, consistent with a knife attack; additional injuries around his neck consistent with strangulation; and defensive wounds, scrapes, bruises, abrasions, and contusions on his body. The linings of each of Nolte's jeans pockets were pulled out and were stained with blood. Nolte's truck keys and cell phone were missing. Crime scene investigators collected evidence from the Troost residence, including a human hair found in the lining of Nolte's right pants pocket, and cat hairs found in his left pocket.
On March 10, 2004, two days after Nolte was murdered, Polk asked his wife to drive him to the location where they had left Nolte's truck. Polk told his wife that he "had some things that he needed to get rid of." When they arrived at the truck, Polk placed a bag of clothing in the middle of the road and set it on fire.
When the police interviewed Polk, he admitted that he had seen Nolte on the night of the murder. Polk claimed that he and Nolte had gone into Kansas, where Nolte abandoned him, and that Polk's wife then came to pick him up. Polk stated that he and his wife went directly home and went to sleep. When an investigator asked Polk about cell phone records showing multiple calls between Polk and his wife after 3:00 a.m. on the morning of March 8, Polk replied that they had called each other from opposite ends of their trailer home.
By May 2004, Polk and his wife were no longer living together. In October 2004, Polk showed up at his wife's residence and told her that she "knew too much and wouldn't be going to work that day or probably any other day." Polk tried to force his wife into his car, but she resisted. He finally gave up and grabbed her keys, purse, and wallet. A few days later, a state trooper spotted Polk, who was subject to an outstanding arrest warrant for murder. Polk attempted to flee but was apprehended.
Polk was charged with first-degree murder *813 (§ 565.020)[3] and armed criminal action (§ 571.015) for causing Nolte's death. Polk was charged in a separate case with robbery in the second degree (§ 569.030) and domestic assault in the second degree (§ 565.073) for the October 2004 incident involving his wife. The trial court sustained the State's motion and consolidated the two cases for all purposes, including for trial.[4]
Nolte's wife told the police that, shortly before he died, Nolte had planned on firing a person who worked with him, Aaron Larson, and also planned to evict Larson from property that the Noltes owned. Nolte's wife told police that Nolte " 'informed her that he thought Aaron [Larson] would become angry and if something bad happened to him, to let the police know about Aaron.' " Although Larson was the police's initial suspect in Nolte's murder, police eliminated him as a suspect after his girlfriend provided him with an alibi.
Polk's trial counsel Anthony Cardarella intended to present evidence concerning Larson, and concerning the police's dismissal of Larson as a suspect, as a significant component of Polk's defense. On the first day of trial, however, the State filed a Motion in Limine to prohibit Polk from referring to Larson as a suspect in Nolte's murder. The next day, after hearing argument on the motion, the trial court sustained the State's Motion in Limine. The court held that the defense could not lay an adequate foundation for the introduction of evidence identifying Larson as an alternate perpetrator, because Polk lacked evidence directly connecting Larson to Nolte's murder. Trial counsel did take various actions to present a defense at trial following the circuit court's grant of the State's Motion in Limine , which we describe in greater detail in § I of the Discussion which follows. Cardarella did not, however, make an opening statement, cross-examine any of the State's witnesses, present any evidence on Polk's behalf, or make a closing argument.
On August 12, 2009, the jury returned a verdict finding Polk guilty on each of the charges against him. The circuit court sentenced Polk to life imprisonment without the possibility of parole for first-degree murder; 100 years' imprisonment for armed criminal action; fifteen years' imprisonment for second-degree robbery; and five years' imprisonment for domestic assault in the second degree. The circuit court ordered that the sentences run consecutively.
Polk appealed. Attorney Cardarella, who represented Polk at trial, also represented him on appeal. On appeal, Polk argued that the circuit court abused its discretion by excluding evidence concerning Aaron Larson's potential responsibility for Nolte's murder. Polk also argued that the circuit court had denied him his right to confront the witnesses again him when it permitted a DNA analyst to testify to the results of testing performed by an absent laboratory technician. We rejected Polk's arguments, and affirmed his convictions and sentences in a per curiam order accompanied by an unpublished memorandum. State v. Polk , 366 S.W.3d 542 (Mo. App. W.D. 2011).
*814 Polk filed a pro se motion for postconviction relief under Supreme Court Rule 29.15, and his appointed counsel later filed an amended motion on his behalf. Polk's amended motion contained twenty-three separate allegations of ineffective assistance of counsel. Following an evidentiary hearing at which Polk and Cardarella testified, the circuit court denied postconviction relief.
Polk appeals.
Standard of Review
This Court reviews the denial of post-conviction relief to determine whether the motion court's findings of fact and conclusions of law are clearly erroneous. Rule 29.15(k). "A judgment is clearly erroneous when, in light of the entire record, the court is left with the definite and firm impression that a mistake has been made." Swallow v. State , 398 S.W.3d 1, 3 (Mo. banc 2013).
Watson v. State , 520 S.W.3d 423, 428 (Mo. banc 2017).
Discussion
Polk raises six Points on appeal. He first argues that trial counsel Anthony Cardarella completely failed to subject the State's case to meaningful adversarial testing at trial. Polk argues that counsel's ineffective representation entitles Polk to a new trial without any showing of the specific ways in which counsel's deficient performance prejudiced Polk. In his second Point, Polk argues in the alternative that he established that Cardarella's deficient performance at trial prejudiced him, because there is a reasonable probability of a different outcome if Cardarella had been more active. In his third Point, Polk argues that trial counsel had a conflict of interest, entitling Polk to a new trial without a showing of prejudice, because Polk had complained before trial about Cardarella's performance to Cardarella's supervisor and to bar disciplinary authorities, creating a hostile relationship between Polk and Cardarella. In his fourth Point, Polk argues that Cardarella was ineffective for failing to lay an adequate foundation for the admission of evidence concerning Aaron Larson's possible responsibility for Nolte's murder. In his fifth Point, Polk argues that Cardarella was ineffective for failing to object to the admission of evidence from a State expert concerning the DNA match between cat hairs found in Nolte's pocket, and hairs collected from cats in Polk's home. Finally, in Point VI, Polk argues that Cardarella was ineffective for failing to cross-examine Polk's wife.
I.
In his first Point on appeal, Polk contends that he is entitled to a reversal of his conviction because his trial counsel failed to present any defense at trial. Polk argues that his attorney's inaction resulted in a constructive denial of counsel, which constituted structural error entitling him to a new trial without a specific showing of prejudice.
As a general rule,
A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that *815 the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Strickland v. Washington , 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ; see also , e.g. , Lee v. United States , --- U.S. ----, 137 S.Ct. 1958, 1964, 198 L.Ed.2d 476 (2017) ; Lafler v. Cooper , 566 U.S. 156, 163, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012).
The prejudice showing is in most cases a necessary part of a Strickland claim. The reason is that a defendant has a right to effective representation, not a right to an attorney who performs his duties mistake-free. As a rule, therefore, a violation of the Sixth Amendment right to effective representation is not "complete" until the defendant is prejudiced.
Weaver v. Mass. , --- U.S. ----, 137 S.Ct. 1899, 1910, 198 L.Ed.2d 420 (2017) (citations and internal quotation marks omitted).
In United States v. Cronic , 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), the Supreme Court of the United States recognized "a narrow exception"[5] to Strickland 's requirement that a defendant must prove prejudice to establish ineffective assistance of counsel. Cronic acknowledged the existence of "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." Id. at 658, 104 S.Ct. 2039. Cronic described three categories of cases in which it was unnecessary for a criminal defendant to make a showing of prejudice resulting from his attorney's deficient performance.
Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial. Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable. No specific showing of prejudice was required in Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), because the petitioner had been "denied the right of effective cross-examination" which " 'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.' " Id. , at 318, 94 S.Ct. 1105.
Circumstances of that magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.
Id. at 659-60, 104 S.Ct. 2039 (other citations and footnotes omitted).
In this case, Polk relies on the second Cronic exception: he contends that his trial counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial *816 testing." The Supreme Court has explained that, "[w]hen we spoke in Cronic of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete. " Bell v. Cone , 535 U.S. 685, 696-97, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (emphasis added); see also Fla. v.Nixon , 543 U.S. 175, 190, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004).
To trigger the second Cronic exception,
an attorney must completely fail to challenge the prosecution's case, not just individual elements of it. Critically for purposes of this appeal, the [ Bell ] Court further noted that when applying Strickland or Cronic , the distinction between counsel's failure to oppose the prosecution entirely and the failure of counsel to do so at specific points during the trial is a "difference ... not of degree but of kind." [ 535 U.S. at 697, 122 S.Ct. 1843.] Under this rationale, when counsel fails to oppose the prosecution's case at specific points or concedes certain elements of a case to focus on others, he has made a tactical decision. By making such choices, defense counsel has not abandoned his or her client by entirely failing to challenge the prosecution's case. Such strategic decisions do not result in an abandonment of counsel, as when an attorney completely fails to challenge the prosecution's case. Under the Court's reasoning, then, Cronic is reserved only for those extreme cases in which counsel fails to present any defense. We presume prejudice in such cases because it is as if the defendant had no representation at all. In contrast, strategic or tactical decisions are evaluated under Strickland 's traditional two-pronged test for deficiency and prejudice.
Haynes v. Cain , 298 F.3d 375, 380-81 (5th Cir. 2002) (en banc) (other citations omitted).
Other courts have characterized the second Cronic exception in a similar way. One decision explains that, to trigger the second Cronic exception, "counsel's performance [must be] so defective that he may as well have been absent"; " 'non-representation, not poor representation, triggers a presumption of prejudice.' " Phillips v. White , 851 F.3d 567, 580 (6th Cir. 2017) (quoting Miller v. Martin , 481 F.3d 468, 473 (7th Cir. 2007) ). In the words of another court, "the standard is extremely high for a petitioner asserting that his counsel entirely failed to subject the prosecution's case to meaningful adversarial testing"; to satisfy that standard, "counsel's performance must move beyond patent ineffectiveness into rank incoherence." U.S. ex rel. Madej v. Schomig , 223 F.Supp.2d 968, 971-72 (N.D. Ill. 2002). The Seventh Circuit has stated that " Cronic only applies if counsel fails to contest any portion of the prosecution's case; if counsel mounts a partial defense, Strickland is the more appropriate test." United States v. Holman , 314 F.3d 837, 839 n. 1 (7th Cir. 2002).[6]
Only a single Missouri decision applies the second Cronic exception: State v. Harvey , 692 S.W.2d 290 (Mo. banc 1985)
*817 , a death-penalty case. In Harvey , after defense counsel's request for a continuance was denied, counsel announced that "I will be physically present because I am sure the Court would require that, but I do not in any way intend to participate in the trial of this matter." Id. at 291. The Court noted that, following this statement, "defense counsel 'effectively boycotted the trial proceedings.' " Id. at 292. In those circumstances, the Missouri Supreme Court held that the defendant had established "a complete denial of any assistance of counsel," and "need not satisfy the second prong of the [ Strickland ] inquiry." Id.
Polk's defense counsel Anthony Cardarella took only limited actions on Polk's behalf after the circuit court granted the State's Motion in Limine excluding evidence concerning Aaron Larson. Cardarella did not make an opening statement, did not cross-examine any of the State's witnesses, did not put on any defense evidence, and made no closing argument. Although Cardarella's performance during trial was certainly lacking and should not be condoned, however, this is not a case in which he "fail[ed] to contest any portion of the prosecution's case." Holman , 314 F.3d at 839 n. 1.
Cardarella took numerous actions during the trial to represent Polk, and to defend his interests. Thus, Cardarella conducted extensive voir dire of the jury panel, including after the circuit court's grant of the Motion in Limine. He objected to some of the State's proposed strikes of jurors for cause, and argued for his own for-cause strikes. Cardarella also exercised peremptory strikes on Polk's behalf.
Cardarella objected twice during the prosecution's opening statement, and moved for a mistrial after the State in opening statement contended that DNA found on the burned clothing was "consistent with Stephen Nolte."
Over the course of approximately three days of testimony, Cardarella objected on sixteen occasions to evidence or witness examination. In addition, Cardarella conducted voir dire examinations of two of the State's feline DNA experts, arguing that one of the experts was relying on a late-disclosed report to support her testimony, and that the other should be excluded because she had failed to timely disclose her laboratory notes, and that she lacked personal knowledge to support part of her testimony (supporting an objection under the Confrontation Clause).
In addition to moving for a mistrial during the prosecution's opening statement, Polk's trial counsel also moved for a mistrial on three additional occasions during trial: when the prosecution characterized a fragment of burned fabric recovered by police as a "jacket"; when the State elicited testimony that Polk ran when a law enforcement officer attempted to arrest him; and when the circuit court ruled that the State's feline DNA witnesses would be permitted to testify, despite counsel's claim that the State had failed to timely disclose discovery materials relevant to their testimony.
Cardarella was also successful in having two members of the jury panel excused, during trial, based on contacts between the jurors and witnesses or potential witnesses in the case. In both instances, the prosecution argued that the jurors' actions did not require their removal; yet the court ordered them to be excused, based on Cardarella's argument, and his voir dire of *818 one of the affected jurors. Cardarella also conducted a voir dire examination of a third juror, who had been involved in an automobile accident during a break in the trial, to determine whether she remained capable of serving as a juror. After the juror indicated during Cardarella's examination that she had received no serious injuries and was taking no medication, he did not seek further relief with respect to this juror.
Perhaps most significantly, Cardarella examined six different witnesses, outside the presence of the jury, to develop an extensive offer of proof concerning the admissibility of testimony implicating Aaron Larson in Stephen Nolte's murder. Through these offers of proof, Cardarella established that prior to his murder Nolte was planning on firing and evicting Larson; that Nolte had told his wife that, if something bad happened to him, she should tell the police about Larson; that police were told that Larson may have threatened Nolte; that Larson's neighbors told police that there was blood in Larson's home, and that this blood was recovered by police in executing a search warrant;[7] that an anonymous source called the TIPS hotline and stated that Larson had bragged about committing the crime, and described how he had committed it and where he had left Nolte's truck; and that Larson was the police's initial suspect, but that he was eliminated as a suspect based on an uncorroborated alibi provided by his girlfriend. Although this Court ultimately held that these offers of proof were insufficient to satisfy Missouri's standards for admission of evidence of an alternate perpetrator, Cardarella plainly preserved the issue, and supported his position with an appreciable amount of material information.
Although we do not condone Cardarella's level of activity during Polk's trial, this cannot fairly be characterized as a case in which trial counsel was essentially absent , or in which trial counsel failed to present any defense. Cardarella's involvement in Polk's trial was not so lacking that Polk is excused from showing what difference it would have made if Cardarella had defended him more vigorously.[8]
Point I is denied.
II.
In his second Point, Polk argues in the alternative that he established ineffective *819 assistance of trial counsel under the two-part Strickland test. As we explained in § I, above, under Strickland the defendant must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." 466 U.S. at 687, 104 S.Ct. 2052. Because a defendant is required to satisfy both the performance and prejudice prongs, it is unnecessary for the court "to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697, 104 S.Ct. 2052. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed." Id. at 697, 104 S.Ct. 2052.
In this case, without addressing the adequacy of Cardarella's representation of Polk at trial, we conclude that Polk's ineffective assistance claim fails because he failed to present sufficient evidence to show that he was prejudiced by Cardarella's actions or inactions.
In his appellate Brief, Polk argues that he established prejudice because Cardarella testified at the evidentiary hearing that, before the trial began, he had endorsed witnesses, prepared cross-examinations for the State's witnesses, prepared outlines for his opening statement and closing argument, and "was ready to attack the DNA evidence." Once the trial court granted the State's Motion in Limine , however, Cardarella chose not to use any of his prepared materials. "To demonstrate ineffectiveness of counsel in failing to ... present evidence, a movant is required to show what the evidence would have been." State v. Ramsey , 864 S.W.2d 320, 338 (Mo. banc 1993). As the motion court found, Polk presented no evidence concerning the specific witnesses trial counsel should have called, and what their testimony would have been; what cross-examination questions trial counsel should have asked, and what the witnesses' answers would have been; what specific challenges trial counsel should have made to the DNA evidence; and what effect trial counsel's opening statement and closing argument would have had on the jury.
To show Strickland prejudice, it was not enough for Polk to show that Cardarella had prepared various lines of defense, which he ultimately did not employ. Instead, Polk was required to show what those lines of defense were , and that their exercise would have created a reasonable probability of a favorable outcome. Given Polk's argument and evidence, the circuit court did not clearly err in concluding that his ineffective assistance claim failed to lack of evidence of Strickland prejudice.
Point II is denied.
III.
In his third Point, Polk contends that trial counsel was laboring under "an irreconcilable and actual conflict of interest." According to Polk, this conflict of interest establishes that he was denied the effective assistance of counsel, without a showing of prejudice.
In Strickland , the Supreme Court explained that a presumption of prejudice *820 exists if a defendant's counsel has an actual conflict of interest at the time counsel is representing the defendant. The Court explained:
In Cuyler v. Sullivan , 446 U.S. [335], at 345-350, 100 S.Ct. 1708 [64 L.Ed.2d 333 (1980) ], the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, ... [p]rejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, supra , 446 U.S., at 350, 348, 100 S.Ct. 1708 (footnote omitted).
Strickland , 466 U.S. at 692, 104 S.Ct. 2052 (other citations omitted).
Polk contends that Cardarella was upset that Polk had complained to the circuit court, to Cardarella's supervisor, and to Bar disciplinary authorities concerning Cardarella's performance, and that his relationship with Cardarella soured following his complaints. Polk misunderstands what is meant by an "actual conflict of interest." Animosity between a lawyer and client, standing alone, is not enough to establish the sort of "actual conflict of interest" which would justify a finding of ineffective assistance of counsel without a showing of prejudice. As the Ninth Circuit explained,
in order to succeed on a claim [of ineffective assistance of counsel] based on an alleged conflict, there must be a showing of an actual conflict, namely that a defendant's attorney is representing conflicting interests. ...
Obviously, the word "conflict" is also used in common parlance to describe a personality conflict, an artistic conflict, a family conflict, and many other sorts of antagonism-even war. In this context, however, as the Supreme Court cases make clear, we are talking about legal conflicts of interest-an incompatibility between the interests of two of a lawyer's clients, or between the lawyer's own private interest and those of the client.
Plumlee v. Masto , 512 F.3d 1204, 1210 (9th Cir. 2008) (en banc). The Court held that this standard was not satisfied merely because of a "dysfunctional" relationship between a criminal defendant and his public defender, characterized by "subjective distrust" and "dislike." Id. at 1210-11. See also Miller v. Smith , 765 F.3d 754, 761 (7th Cir. 2014) ("Simply lacking a good rapport with one's appointed counsel does not amount to the contention that a criminal defendant was completely deprived of counsel"); Hale v. Gibson , 227 F.3d 1298, 1313 (10th Cir. 2000) ("The fact that [attorney] did not like [criminal defendant] or did not trust him does not rise to the level of a conflict of interest. Personality conflicts are not conflicts of interest."); Blackmon v. United States , 146 A.3d 1074, 1080 (D.C. 2016) ("A breakdown in communication-even a hostile relationship-between counsel and client is not the same, however, as a conflict of interest that leads counsel *821 to act with less than complete zeal and loyalty to his client.").
Polk does not contend that Cardarella was representing another client with adverse interests, or that Cardarella's representation of Polk was limited by the interests of anyone else, including Cardarella himself. Instead, Polk argues only that his relationship with Cardarella soured over time, and that the animosity between them-coupled with Cardarella's limited defense at trial-establishes an "actual conflict of interest." As explained above, however, the fact that an attorney and a criminal defendant do not get along does not establish an "actual conflict of interest" for Sixth Amendment purposes.
"A conflict of interest such as to deny the movant effective assistance of counsel must be shown by evidence. We presume prejudice only if the movant proves that counsel actively represented conflicting interests and that an actual conflict adversely affected counsel's performance." Hickey v. State , 328 S.W.3d 225, 228 (Mo. App. E.D. 2010). Polk failed to make this showing, and we accordingly deny his third Point.
IV.
In his fourth Point, Polk claims that trial counsel was ineffective for making an insufficient offer of proof concerning the Aaron Larson alternate perpetrator evidence.
As we have explained in § I, above, attorney Cardarella developed an offer of proof concerning the Larson evidence through the testimony of six separate witnesses, which established: that the victim was concerned that Larson might do something bad to him because he was intending to fire and evict Larson; that Larson had threatened the victim; that blood was found in Larson's home; that an anonymous tipster had informed police that Larson had described and bragged about his commission of the crime; and that Larson was in fact the police's initial suspect.
In his appellate Brief, Polk claims that trial counsel's offer of proof was deficient because it failed to include testimony from Polk himself. At the evidentiary hearing, Polk testified that Larson had allegedly been abusing drugs and alcohol, had become unreliable, and that Nolte was "planning on firing him." This additional testimony would have added nothing of substance to the evidence already preserved by Cardarella in his offers of proof. Cardarella had already established that Nolte was planning on firing and evicting Larson, and was concerned that Larson would react angrily or even violently.
Further, even if Polk's testimony had been included in the offer of proof, it would not have rendered the Larson evidence admissible, because-as we explained in our memorandum in Polk's direct appeal-to be admissible, alternate perpetrator evidence " 'must tend to prove that the other person committed some act directly connecting him with the crime.' " State v. Nash , 339 S.W.3d 500, 513 (Mo. banc 2011) (quoting State v. Rousan , 961 S.W.2d 831, 848 (Mo. banc 1998) ). Alternate perpetrator evidence is not admissible "[w]hen the evidence is merely that another person had opportunity or motive to commit the offense." State v. Bowman , 337 S.W.3d 679, 686 (Mo. banc 2011). At best, Polk's testimony would only have provided additional evidence of Larson's potential motive to harm Nolte; it did nothing to directly connect Larson to the corpus delicti.
*822 "To establish an ineffective assistance of counsel claim based on an inadequate offer of proof, the Movant must prove that the evidence offered would have been admissible if an adequate offer of proof had been made." Barnes v. State , 334 S.W.3d 717, 722 (Mo. App. E.D. 2011). Polk's testimony would not have established the admissibility of evidence implicating Larson. Because Polk has failed to demonstrate a reasonable probability of a different outcome if his trial counsel had made a fuller offer of proof concerning the Larson evidence, we deny Point IV.
V.
In his fifth Point, Polk argues that trial counsel was ineffective for failing to object to Dr. Joy Halverson's testimony concerning the results of the DNA testing of the cat hairs found in Nolte's pocket, and of cat hair samples taken from Polk's cats. Dr. Halverson testified that certain of the cat hairs recovered from the trailer where Polk lived shared the same mitochondrial DNA sequence as the cat hairs found on Nolte. Polk argues that Dr. Halverson's testimony was inadmissible, because her DNA analysis is not generally accepted in the scientific community.
Polk's Point Relied On, and his argument, focus solely on counsel's failure to object to the testimony of Dr. Halverson. At trial, however, Dr. Halverson was not the only witness to testify to a comparison of the mitochondrial DNA of the cat hair found on Nolte, and the mitochondrial DNA of cats found in Polk's trailer. Both Dr. Leslie Lyons, and Elizabeth Wictum, testified that the mitochondrial DNA profile derived from the cat hair recovered from Nolte's pocket matched the profiles of two hairs collected from cats at Polk's home. Both Dr. Lyons and Wictum testified that they compared the mitochondrial DNA profile derived from the hair found on Nolte to the mitochondrial DNA profiles of other cats contained in databases they maintained; both witnesses testified that the mitochondrial DNA profile of the hair collected from Nolte-which matched two hairs collected from cats in Polk's home-was "unique."
Thus, Dr. Lyons and Wictum provided testimony that duplicates the testimony from Dr. Halverson which Polk argues attorney Cardarella should have challenged. In these circumstances, Polk cannot establish that he was prejudiced, even if Cardarella's performance was deficient in failing to challenge Dr. Halverson's testimony. "Counsel's failure to object to cumulative evidence, even where the trial court would have sustained the objection, does not result in prejudice." Farr v. State , 408 S.W.3d 320, 323 (Mo. App. E.D. 2013) (citing Moss v. State , 10 S.W.3d 508, 512 (Mo. banc 2000) ); accord Coday v. State , 179 S.W.3d 343, 358 (Mo. App. S.D. 2005).
Point V is denied.
VI.
Polk's final Point contends that trial counsel was ineffective for failing to cross-examine Polk's wife concerning inconsistencies between her trial testimony and certain of her pretrial statements.
" 'The extent of cross-examination is usually a matter of trial strategy.' " Rios v. State , 368 S.W.3d 301, 310 (Mo. App. W.D. 2012) (quoting Rousan v. State , 48 S.W.3d 576, 594 (Mo. banc 2001) ). " 'The decision whether or not to impeach a witness with a prior inconsistent statement is a matter of trial strategy and cannot be the basis for finding ineffective assistance of counsel.' " Fry v. State , 244 S.W.3d 284, 287 (Mo. App. S.D. 2008) (citation and internal quotation marks omitted).
*823 Whether or not trial counsel performed ineffectively in failing to cross-examine Polk's wife, "[t]he mere failure to impeach a witness does not entitle a movant to postconviction relief. The movant has the burden of establishing that the impeachment would have provided the movant with a defense or would have changed the outcome of the trial." Id. (citations and internal quotation marks omitted). In this case, Polk's wife had acknowledged the inconsistencies in her pretrial statements during her direct examination. She testified that she did not immediately give the police a truthful account of what had happened on the night of Nolte's murder, because she was afraid after Polk told her that she would also be charged if she told the police the truth. Other testimony from Polk's wife suggests that she was not initially forthcoming because she was physically afraid of Polk.
Given that evidence of the prior inconsistent statements made by Polk's wife had already been developed in her direct examination, and that the reasons for the inconsistencies did not paint Polk in a favorable light, we cannot say that the circuit court clearly erred in concluding that Cardarella made a reasonable strategic decision not to cross-examine Polk's wife concerning these inconsistencies, and that Polk was not prejudiced by the lack of such cross-examination.
Point VI is denied.
Conclusion
We affirm the judgment of the circuit court, which denied Polk's motion for postconviction relief under Rule 29.15.
All concur.

"This Court reviews the facts in the light most favorable to the verdict." Bucklew v. State , 38 S.W.3d 395, 396 (Mo. banc 2001) (citation omitted); see also , e.g. , Moore v. State , 502 S.W.3d 751, 752 n.3 (Mo. App. W.D. 2016).

Polk was charged with domestic assault against his wife. Pursuant to § 595.226.1, RSMo 2016, we therefore do not identify Polk's wife by name.

Unless otherwise indicated, statutory citations refer to the 2000 edition of the Revised Statutes of Missouri.

Judge Anthony Rex Gabbert, who is currently a member of this Court, presided over Polk's trial. Judge Gabbert has taken no part in the consideration or decision of this appeal.

Fla. v.Nixon , 543 U.S. 175, 190, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004).

Quoted in People v. Cherry , 407 Ill.Dec. 439, 63 N.E.3d 871, 880 (2016). See also , e.g. , Castillo v. Florida , 722 F.3d 1281, 1287-88 (11th Cir. 2013) ; State v. Jedlicka , 297 Neb. 276, 900 N.W.2d 454, 469 (2017) ("the difference between the Strickland and Cronic rules [i]s the difference between bad lawyering and no lawyering"); Davis v. Comm'r of Correction , 319 Conn. 548, 126 A.3d 538, 543-44 (2015) ("courts have drawn a distinction between 'maladroit performance' and 'non-performance' by applying Cronic in cases where counsel's conduct goes beyond 'bad, even deplorable assistance' and constitutes 'no representation at all' "; citations omitted).

The blood evidence collected from Larson's home was not connected to Nolte, Larson, or to any other person associated with Nolte's murder.

Attorney Cardarella's actions during trial in this case are comparable to, or exceed, the level of effort of counsel in the following cases, where courts found Cronic 's second exception to be inapplicable: Smith v. Brown , 764 F.3d 790, 797 (7th Cir. 2014) (finding second Cronic exception inapplicable even though counsel's cross-examination of assault victim "ended after only a few questions," counsel "entirely failed to cross-examine any other witness," and counsel's "closing statement was equivocal and perfunctory to the point of being useless"); Mayfield v. State , No. 07-14-00055-CR, 536 S.W.3d 523, 527-28, 2017 WL 952388, at *4 (Tex. App. Feb. 9, 2017) (refusing to apply Cronic exception where counsel did not further participate following defendant's suicide attempt and absence from courtroom, and court's denial of counsel's request for a competency examination, after first day of trial; emphasizing that counsel repeatedly renewed request for competency examination, and that "counsel's choices were intentional and strategic," and "were not taken ... merely for the reason that the attorney was 'unprepared to go forward' "); In re Williams , 197 Vt. 39, 101 A.3d 151, 158, 159-60 (2014) (Cronic exception inapplicable where counsel's efforts during sentencing proceeding were not "tantamount to non-representation"; "[d]efense counsel called no witnesses" and did not file a sentencing memorandum, but "[i]nstead, ... [merely] offered a few remarks about petitioner's childhood, essentially repeating the information in the [pre-sentence investigation report]"); Walker v. State , 391 Md. 233, 892 A.2d 547, 555 (2006) (refusing to apply second Cronic exception where, after defendants absconded and were tried in absentia , "[a]s a trial strategy, [counsel] decided essentially to remain silent, to protect the record as best as he could under the circumstances, to participate minimally, and to argue jury nullification-the latter of which the Circuit Court did not allow").